**Louis AQUILINO,**

v.

**The PHILADELPHIA CATHOLIC ARCHDIOCESE, Father Michael D'Onofrio and St. Thomas Aquinas Roman Catholic Church**

Appeal of: Father Michael D'Onofrio.

**Louis Aquilino, Appellant,**

v.

**Father Michael D'Onofrio.**

Superior Court of Pennsylvania.

Argued May 25, 2005.

Filed Oct. 4, 2005.

Peter J. Mooney, Philadelphia, for D'Onofrio.

John T. Asher and George M. Vinci, Jr., Philadelphia, for Aquilino.

C. Clark Hodgson, Philadelphia, for Archdiocese of Philadelphia and St. Thomas Aquinas Roman Catholic Church.

BEFORE: DEL SOLE, P.J., BENDER and OLSZEWSKI, JJ.

OPINION BY BENDER, J.:

¶ 1 Louis Aquilino (Aquilino), the plaintiff below, appeals from the October 1, 2004 final judgment entered subsequent to the September 8, 2003 grant of judgment on the pleadings in favor of defendants Archdiocese of Philadelphia (the Archdiocese) and St. Thomas Aquinas Catholic Church (the Parish), on the basis of the running of the statute of limitations. This case also involves the appeal of a third defendant, Michael D'Onofrio (Father D'Onofrio), the priest whom Aquilino claimed had sexually abused him in 1982 and 1983. After Father D'Onofrio failed to answer Aquilino's complaint, the court entered a default judgment against him on January 13, 2004, and, at a subsequent assessment of damages hearing, a jury awarded Aquilino $450,000 against Father D'Onofrio. Father D'Onofrio appeals, alleging defective service of process. We affirm the judgments in both instances.[1]

¶ 2 We first set forth the relevant factual and procedural history, in further detail. Aquilino initiated this action by writ of summons on May 7, 2002, and filed a complaint on April 28, 2003. In his complaint, Aquilino alleged that when he was 12 and

---

1. We take this opportunity to clarify the multiple appeals taken in this case. Father D'Onofrio filed (1) an appeal from the September 2, 2004 order denying his petition to open or strike the default judgment (docketed in our Court at 2660 EDA 2004), (2) an appeal from the September 24, 2004 order denying post trial motions (docketed at 2823 EDA 2004), and (3) an appeal from the final judgment entered on October 1, 2004 (docketed at 2824 EDA 2004). Aquilino filed (1) an appeal from the September 24, 2004 order denying post trial motions (docketed at 2932 EDA 2004), and (2) an appeal from the October 1, 2004 final judgment (docketed at 2933 EDA 2004). Our Court inadvertently quashed the appeals taken from the final judgment, i.e., the appeals at 2824 EDA 2004 and at 2933 EDA 2004. We hereby reinstate and consolidate those appeals, i.e., at 2824 EDA 2004 and 2933 EDA 2004, as they were properly taken from the final judgment. We dismiss the appeals filed from the order denying post trial motions and the order denying the petition to open/strike (i.e., 2660 EDA 2004, 2823 EDA 2004, and 2932 EDA 2004). See Mackall v. Fleegle, 801 A.2d 577, 580 (Pa.Super.2002) (explaining that an appeal from order denying post trial motion is interlocutory). We have revised the caption accordingly.

13 years old in 1982 and 1983, he was sexually abused on numerous occasions by Father D'Onofrio, the Parish's priest at the time. Aquilino alleged that it was not until March of 2002, when he saw the movie *E.T.*, which he had originally seen with Father D'Onofrio years before, that he began to recall the numerous instances of abuse. Aquilino recalled specific details about the physical aspects of the sexual abuse, Father D'Onofrio's grooming behavior, and Father D'Onofrio's threats to Aquilino, *e.g.*, telling Aquilino that he would not go to heaven if he told anyone about the abuse, and saying such things as it was "God's secret" and "[t]his is the way to heaven." Aquilino contended that the Archdiocese and the Parish deliberately concealed sexual abuse by priests including Father D'Onofrio, whom they later transferred from parish to parish and, eventually, to Peru.

¶ 3 The Archdiocese and the Parish filed an answer with new matter on May 28, 2003. On June 17, 2003, the Archdiocese and the Parish filed a motion for judgment on the pleadings, alleging, *inter alia*, that the statute of limitations had run on Aquilino's claims. After a hearing, the Honorable Arnold J. New, by order dated September 8, 2003, granted the Archdiocese's and the Parish's motion for judgment on the pleadings on the basis of the statute of limitations, and dismissed, with prejudice, the case against the Archdiocese and the Parish.

¶ 4 However, the case continued against Father D'Onofrio, who failed to answer Aquilino's complaint. Aquilino had served Father D'Onofrio at his last known address in Peru. As noted above, the court entered a default judgment against Father D'Onofrio on January 13, 2004. Pursuant to an assessment of damages hearing held on April 28, 2004, a jury found in favor of Aquilino and against Father D'Onofrio in the amount of $450,000.

¶ 5 On May 10, 2004, for the first time, counsel entered his appearance for Father D'Onofrio and later filed a post trial motion and a petition to open or strike the default judgment, raising the issue of defective service upon Father D'Onofrio in Peru. Aquilino also filed a post trial motion seeking additur of the jury award and reversal of the court's prior ruling that dismissed his complaint against the Archdiocese and the Parish. The Honorable John M. Younge denied Father D'Onofrio's petition to open/strike on September 2, 2003, and Judge Younge denied both parties' post trial motions on September 24, 2004. On October 1, 2004, Judge Younge entered judgment on the verdict in the amount of $450,000.

¶ 6 Aquilino now appeals from the final judgment, specifically challenging Judge New's earlier dismissal of the Archdiocese and the Parish on their motion for judgment on the pleadings.[2] Father D'Onofrio also appeals from the judgment entered on the jury verdict, alleging defective service of process. We will first address Aquilino's appeal from the dismissal of his complaint against the Archdiocese and the Parish.

### Aquilino's Appeal

¶ 7 Aquilino argues that Judge New erred by granting the Archdiocese's and the Parish's motion for judgment on the pleadings on the basis of the passing of the statute of limitations. We first note the applicable standard and scope of review:

---

**2.** Although Aquilino also sought additur in his post trial motion and later raised this issue in his statement of matters complained of on appeal (Pa.R.A.P. 1925(b)), he raises no related issue in the briefs he has filed on appeal.

Appellate review of an order granting a motion for judgment on the pleadings is plenary. The appellate court will apply the same standard employed by the trial court. A trial court must confine its consideration to the pleadings and relevant documents. The court must accept as true all well pleaded statements of fact, admissions, and any documents properly attached to the pleadings presented by the party against whom the motion is filed, considering only those facts which were specifically admitted.

*Lewis v. Erie Ins. Exchange,* 753 A.2d 839, 842 (Pa.Super.2000) (quotation omitted). "We will affirm the grant of such a motion only when the moving party's right to succeed is certain and the case is so free from doubt that the trial would clearly be a fruitless exercise." *Holt v. Lenko,* 791 A.2d 1212, 1214 (Pa.Super.2002) (quotation omitted).

*Crews v. Seven Springs Mountain Resort,* 874 A.2d 100, 102 (Pa.Super.2005).

■ ¶ 8 Against the Archdiocese and the Parish, Aquilino set forth counts of intentional infliction of emotional distress, negligence, negligent infliction of emotional distress, battery, false imprisonment, fraudulent concealment, negligence *per se,* common law duty of reasonable care, breach of fiduciary duty, and respondeat superior. A two-year statute of limitations period applies to these claims. 42 Pa.C.S. § 5524. In a similar case our Court decided recently, we stated:

The statute begins to run "as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 468 A.2d 468, 471 (1983). A person asserting a claim "is

under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." *Id.*

The statute of limitations requires "aggrieved individuals to bring their claims within a certain time of the injury, so that the passage of time does not damage the defendant's ability to adequately defend against claims made ... the statute of limitations supplies the place of evidence lost or impaired by lapse of time, by raising a presumption which renders proof unnecessary." *Dalrymple v. Brown,* 549 Pa. 217, 701 A.2d 164, 167 (1997). Statutes of limitations "are designed to effectuate three purposes: (1) preservation of evidence; (2) the right of potential defendants to repose; and (3) administrative efficiency and convenience." *Kingston Coal Company v. Felton Min. Co., Inc.,* 456 Pa.Super. 270, 690 A.2d 284, 288 (1997).

*Meehan v. Archdiocese of Philadelphia,* 870 A.2d 912, 919 (Pa.Super.2005).

■ ¶ 9 Unless Aquilino establishes an exception to the limitations period, his case against the Archdiocese/Parish is time-barred on its face, because he filed his complaint approximately 20 years after the sexual abuse occurred. Apparently, Aquilino recognizes that "recovery of repressed memory cannot extend statutory limitations." *Dalrymple,* 701 A.2d at 171. Under *Dalrymple,* an argument that the statute of limitations began to run at the point Aquilino recalled his repressed memories of the abuse would fail. Thus, Aquilino argues that the Archdiocese/Parish is vicariously liable for the acts of Father D'Onofrio and, therefore, the statute of limitations should be tolled with regard to his claims against the Archdiocese/Parish to account for Father D'Onofrio's depar-

ture from the Commonwealth. Additionally, Aquilino argues that we should apply the New Jersey statute of limitations, with different tolling provisions, to those allegations of abuse that occurred in New Jersey. We address these arguments in the order presented.

■ ¶ 10 First, Aquilino argues that the trial court ignored certain facts pled in his complaint which established an employer/employee or agency relationship between the Archdiocese/Parish and Father D'Onofrio. Based on these facts, as pled in his complaint, which must be taken as true for purposes of determining the propriety of a judgment on the pleadings, Aquilino contends that the Archdiocese/Parish is vicariously liable for Father D'Onofrio's conduct. Based on his claim of vicarious liability, Aquilino then argues that the statute of limitations should be tolled as to the Archdiocese/Parish based on Father D'Onofrio's absence from the Commonwealth. He relies upon the following tolling provision:

### § 5532. Absence or concealment

(a) **General rule.**—If, when a cause of action accrues against a person, he is without this Commonwealth, the time within which the action or proceeding must be commenced shall be computed from the time he comes into or returns to this Commonwealth. If, after a cause of action has accrued against a person, he departs from this Commonwealth and remains continuously absent therefrom for four months or more, . . . the time of his absence . . . is not a part of the time within which the action or proceeding must be commenced.

42 Pa.C.S. § 5532(a). Aquilino also asserted that the Archdiocese/Parish was responsible for transferring Father D'Onofrio from parish to parish and, eventually, to Peru.

¶ 11 Although Aquilino set forth facts in his complaint to establish his vicarious liability claim against the Archdiocese/Parish, he cites no legal authority to support his proposition that the tolling provision to the statute of limitations found in section 5532(a), which may be applicable to defendant Father D'Onofrio for the time he was in Peru, can be imputed to a different defendant, *i.e.,* the Archdiocese/Parish, who remained in the Commonwealth at all relevant times. Nothing in the plain language of the statute suggests that the tolling provisions are interchangeable among codefendants, even if the plaintiff makes a claim of vicarious liability. In other words, contrary to Aquilino's argument, it does not necessarily follow that the tolling of the statute of limitations based on the acts of one defendant would be imputed to another defendant who may be vicariously liable for the first defendant's actions. Accordingly, we find Aquilino's argument, although creative, to be without merit.

■ ¶ 12 Aquilino also contends that his complaint set forth facts, when accepted as true, were sufficient to toll the statute of limitations under New Jersey law. He argues that his claims of vicarious liability against the Archdiocese/Parish with regard to Father D'Onofrio's acts of abuse that occurred in New Jersey require application of the New Jersey statute of limitations, which, according to Aquilino, would make his claims against the Archdiocese/Parish timely. *See* Aquilino's brief at 17 (citing N.J.S.A. 2A:61B–1(c)).

¶ 13 This argument is without merit. Nowhere in the complaint does Aquilino allege that acts of sexual abuse occurred in New Jersey. With regard to New Jersey, Aquilino only alleged that Father D'Onofrio took him on trips to the New Jersey shore "where they went on amusement rides and went on the beach[.]" Com-

plaint, 4/28/03, at ¶ 16(a). His complaint indicates that incidents of sexual abuse occurred in Father D'Onofrio's bedroom at the rectory, *id.* at ¶¶ 19–20, in the Parish's basement, *id.* at ¶ 22, and in the basement of Father D'Onofrio's parents' house, *id.* at ¶ 21, all of which are locations within the Commonwealth of Pennsylvania. It is only in his brief on appeal that he alleges, for the first time, that incidents of sexual abuse occurred in New Jersey. Accordingly, Aquilino's argument that New Jersey law should apply with regard to instances of sexual abuse that occurred in New Jersey is without merit because nowhere in his complaint did he allege that sexual abuse occurred in New Jersey. For this reason alone, Aquilino's argument is not persuasive.

■ ¶ 14 However, assuming *arguendo* that Aquilino did plead that incidents of abuse occurred in New Jersey, he cites no authority for the proposition that the court should have split application of Pennsylvania and New Jersey statutes of limitation based on the fact that some incidents occurred in New Jersey. Rather, where it is determined that the laws of the competing states differ, *i.e.,* a conflict exists, the court "must then analyze the governmental interests underlying the issue and determine which state has the greater interest in the application of its law." *Keystone Aerial Surveys, Inc. v. Pennsylvania Prop. & Cas. Ins. Guar. Ass'n,* 777 A.2d 84, 94 (Pa.Super.2001) (citation omitted). Had the court engaged in such an analysis, it would have likely determined that Pennsylvania had the greater interest in the application of its law, given that the abuse occurred primarily in Pennsylvania (again assuming *arguendo* that some incidents occurred in New Jersey), and all the parties were Pennsylvania residents at the relevant time.

■ ¶ 15 Next, Aquilino argues that the doctrine of fraudulent concealment applies to toll the statute of limitations against the Archdiocese/Parish.

The doctrine of fraudulent concealment is an exception to the requirement that a complaining party must file suit within the statutory period. Where, "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry, the defendant is estopped from invoking the bar of the statute of limitations." *Kingston Coal Company [v. Felton Min. Co., Inc.],* 456 Pa.Super. 270, 690 A.2d [284,] 290 [ (Pa.Super.1997) ] (citing *Molineux v. Reed,* 516 Pa. 398, 532 A.2d 792, 794 (Pa.1987)).

*Baselice v. Franciscan Friars Assumption BVM Province, Inc.,* 2005 PA Super 246, 20, 879 A.2d 270 (2005).

¶ 16 Aquilino argues that his complaint set forth two factual bases to support his contention that he was unable to recognize that he had claims against the Archdiocese/Parish: (1) the religious training he received from the Archdiocese/Parish and their priests; and (2) the fraudulent concealment by the Archdiocese/Parish of the problem of sexual abuse of minors among the clergy. Aquilino's brief at 21. He alleges that these facts combined prevented him from appreciating that he may have a claim against the Archdiocese/Parish based on the abuse inflicted upon him by Father D'Onofrio. *Id.* He argues that his claims against the Archdiocese/Parish "cannot be determined solely based on the pleadings themselves since they bring up factual issues, i.e. exactly what [Aquilino] was taught and how it may have impacted his ability to appreciate that he had claims against [the Archdiocese/Parish], and the extent to which the concealment by [the Archdiocese/Parish] of their knowledge of the sexual abuse of the clergy had on

[Aquilino's] ability to recognize that he had claims against [the Archdiocese/Parish]." *Id.*

¶ 17 In *Baselice,* the plaintiff alleged that a priest sexually abused him from 1992 through 1996. *Baselice, supra,* at 2. The plaintiff initiated his case against the priest, the Archdiocese of Philadelphia, and other related defendants, in June of 2004, outside of the applicable statute of limitations. The trial court entered judgment on the pleadings based on the expiration of the statute of limitations period. On appeal, the plaintiff asserted that the doctrine of fraudulent concealment applied to toll the statute of limitations. Although the plaintiff was aware of the sexual abuse by the priest at the time it happened, he claimed that he was "unaware until recently that [the Archdiocese and related defendants] were possible causes of his injuries." *Id.* at 6. We stated that, to establish fraudulent concealment,

> [t]he defendant's conduct need not rise to fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient ... mere mistake, misunderstanding or lack of knowledge is insufficient however, and the burden of proving such fraud or concealment, by evidence which is clear, precise and convincing, is upon the asserting party. Moreover, in order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiff justifiably relied.

*Id.* at 20 (citations and quotation marks omitted). We concluded that the plaintiff only alleged that the Archdiocese's "general conduct and/or silence concealed from him an additional theory of liability for the alleged abuse" and that such an allegation was insufficient to toll the statute of limitations based on the doctrine of fraudulent concealment. *Id.* at 24. We explained:

> Had [the plaintiff] (sometime after the abuse but before the running of the statute of limitations) questioned the Archdiocese about his abuser (for example, questions about his abuser's current location or history within the church), and had the Archdiocese affirmatively and independently acted in response to [the plaintiff's] inquiries so as to mislead [the plaintiff] into forgoing his suit, the fraudulent concealment exception would later allow [the plaintiff's] suit. The general and systematic conduct alleged by [the plaintiff] here, however, does not constitute an affirmative act for purposes of the fraudulent concealment exception, and [the plaintiff] has not shown that he relied on any affirmative act of concealment by the defendants which caused him to forgo pursuit of his cause of action. We agree that "to postpone the accrual of causes of action until [appellant] completed [his] investigation of all potential liability theories would destroy the effectiveness of the limitations period." [*Meehan,* 870 A.2d at 922]. Therefore, the fraudulent concealment exception is inapplicable and does not toll the statute of limitations in this matter.

*Baselice, supra,* at 25. Similarly, one of the plaintiffs in *Meehan,* who, like Aquilino, recalled repressed memories of abuse many years later, also asserted the applicability of the doctrine of fraudulent concealment to overcome the statute of limitations problem with regard to his claims of sexual abuse by a priest. The *Meehan* plaintiff argued that the doctrine of fraudulent concealment should apply because the priest "disguised illegal and immoral acts as sanctioned by God[.]" *Meehan,* 870 A.2d at 923. In rejecting this argument, we stated that "a defendant's gener-

al assurances that a situation or condition being experienced by the plaintiff is normal do not rise to the level of fraudulent concealment where the plaintiff's own common sense should inform him that he has been injured." *Id.*

¶ 18 We must reject Aquilino's fraudulent concealment argument on the basis of *Meehan* and *Baselice.* Like the plaintiffs in those cases, Aquilino asserted in his complaint that Father D'Onofrio told him that his actions were sanctioned by God, *see Meehan,* and made assertions about the Archdiocese's knowledge of, and concealment of, the problem of sexual abuse among the clergy, *see Baselice. See also E.J.M. v. Archdiocese of Philadelphia,* 424 Pa.Super. 449, 622 A.2d 1388, 1395 (1993) (concluding that priest's assurances to abuse victim that abuse was necessary for victim's spiritual development were insufficient to establish fraudulent concealment). Such assertions are insufficient for application of the doctrine of fraudulent concealment.

¶ 19 However, Aquilino also averred that the Archdiocese, consistent with its practice of transferring offending priests from parish to parish, transferred Father D'Onofrio to Peru. Complaint at ¶ 60. Despite this more specific assertion with regard to the Archdiocese's handling of Father D'Onofrio, Aquilino still failed to aver that he "questioned the Archdiocese about his abuser" at any time. *See Baselice, supra,* at 25. He did not, for example, assert that he questioned the Archdiocese/Parish about "his abuser's current location or history with the church." *Id.* As we concluded in *Baselice,* had Aquilino made these inquiries and "had the Archdiocese affirmatively and independently acted in response to [Aquilino's] inquiries so as to mislead [Aquilino] into forgoing his suit, the fraudulent concealment exception would later allow [Aquilino's] suit." *Id.*

However, nowhere in the complaint does Aquilino aver that he made any inquiries to the Archdiocese/Parish whatsoever, or that the Archdiocese/Parish responded by misleading him into foregoing his suit against them. Thus, Aquilino has failed to establish that the doctrine of fraudulent concealment applies to toll the statute of limitations.

¶ 20 In summary, Aquilino has not persuaded this Court that Judge New erred by granting judgment on the pleadings in favor of the Archdiocese/Parish.

### Father D'Onofrio's Appeal

¶ 21 As noted above, Aquilino filed his complaint on April 29, 2003. Aquilino filed affidavits of service on August 8, 2003, and September 3, 2003, attesting that the complaint was delivered by Federal Express in July of 2003 to Father D'Onofrio's address at a mission in Peru, *i.e.,* Parroquia San Pedro, Apartado 13, Andahuaylas, Apurimac, Peru ("Peruvian address"), which the Archdiocese had provided to Aquilino during pre-complaint discovery. Nevertheless, Father D'Onofrio failed to respond to the complaint. Accordingly, on January 13, 2004, Judge Younge entered a default judgment against Father D'Onofrio. On April 28, 2004, a jury assessed damages against Father D'Onofrio in the amount of $450,000.

¶ 22 For the first time, on May 10, 2004, Father D'Onofrio's counsel entered his appearance and, shortly thereafter, he filed a motion for post trial relief and a petition to open or strike the judgment. Essentially, in both motions, Father D'Onofrio contended that effective service had not been made and that the judgment against him should be vacated. The court held a hearing on July 20, 2004. Judge Younge denied Father D'Onofrio's motion to strike/open on September 2, 2004, and denied his

post trial motion on September 24, 2004, prompting him to file the instant appeal.

■ ¶ 23 The argument portion of Father D'Onofrio's brief consists of two parts—in the first he argues that the court erred by denying his motion to strike the default judgment and in the second he argues that the court erred by denying his motion to open the judgment. We address these separately, because "[a] petition to strike a default judgment and a petition to open a default judgment request distinct remedies and generally are not interchangeable." *Erie Ins. Co. v. Bullard,* 839 A.2d 383, 386 (Pa.Super.2003). However, we first note that

> [o]ur standard of review regarding the denial of a petition to open or strike a default judgment requires that we:
>
>> examine the entire record for any abuse of discretion, reversing only where the trial court's findings are inconsistent with the clear equities of the case. Moreover, this Court must determine whether there are equitable considerations which require that a defendant, against whom a default judgment has been entered, receive an opportunity to have the case decided on the merits. Where the trial court's analysis was premised upon record evidence, where its findings of fact were deductions from other facts, a pure result of reasoning, and where the trial court made no credibility determinations, this Court may draw its own inferences and arrive at its own conclusions. Finally, where the equities warrant opening a default judgment, this Court will not hesitate to find an abuse of discretion.

*Reid v. Boohar,* 856 A.2d 156, 159 (Pa.Super.2004) (quoting *Duckson v. Wee Wheelers, Inc.,* 423 Pa.Super. 251, 620 A.2d 1206, 1208–09 (1993) (internal citations omitted)). Additionally, we note that, "[a] court must

have personal jurisdiction over a party to enter a judgment against it. [A]ction taken by a court without jurisdiction is a nullity. Because jurisdiction over a person is dependent upon proper service, the Pennsylvania Supreme Court has held that the rules relating to service of process must be strictly followed." *Dubrey v. Izaguirre,* 454 Pa.Super. 504, 685 A.2d 1391, 1393 (1996) (citations and quotation marks omitted).

■ ¶ 24 With regard to a motion to strike a default judgment, "[a] court may only look at the facts of record at the time judgment was entered to decide if the record supports the judgment. A petition to strike does not involve the discretion of the court." *Erie Ins. Co.,* 839 A.2d at 386 (quoting *Triangle Printing Co. v. Image Quest,* 730 A.2d 998, 999 (Pa.Super.1999)). "A petition to strike a judgment will not be granted unless a fatal defect in the judgment appears on the face of the record. Matters outside of the record will not be considered, and if the record is self-sustaining, the judgment will not be stricken." *Cargitlada v. Binks Mfg. Co.,* 837 A.2d 547, 549–50 (Pa.Super.2003) (citation omitted).

¶ 25 Father D'Onofrio argues that the court should have struck the default judgment because the record establishes, on its face, that service of the complaint was defective in that neither Father D'Onofrio nor his authorized agent signed the return receipt on the Federal Express delivery. We disagree for the following reasons, but first set forth the basic rules for service outside the Commonwealth.

¶ 26 The pertinent language of Pennsylvania's long-arm statute provides as follows: .

**§ 5323. Service of process on persons outside this Commonwealth**

(a) **Manner of service.**—When the law of this Commonwealth authorizes service of process outside this Commonwealth, the service, when reasonably calculated to give actual notice, may be made:

. . .

(3) By any form of mail addressed to the person to be served and requiring a signed receipt.

. . .

(b) **Proof of service.**—Proof of service outside this Commonwealth may be made by affidavit of the individual who made the service or in the manner provided or prescribed by the law of this Commonwealth. . . . When service is made by mail, proof of service shall include a receipt signed by the addressee or other evidence of personal delivery to the addressee satisfactory to the tribunal.

42 Pa.C.S. § 5323(a)(3), (b). The relevant rules of civil procedure provide:

**Rule 402.   Manner of Service.   Acceptance of Service**

(a) Original process may be served

. . .

(2) by handing a copy

(i) at the residence of the defendant to an adult member of the family with whom he resides; but if no adult member of the family is found, then to an adult person in charge of such residence; or

(ii) at the residence of the defendant to the clerk or manager of the hotel, inn, apartment house, boarding house or other place of lodging at which he resides; or

(iii) at any office or usual place of business of the defendant to his agent or to the person for the time being in charge thereof.

Pa.R.C.P. 402(a)(2).

**Rule 403.   Service by Mail**

If a rule of civil procedure authorizes original process to be served by mail, a copy of the process shall be mailed to the defendant by any form of mail requiring a receipt signed by the defendant or his authorized agent. Service is complete upon delivery of the mail.

Pa.R.C.P. 403. *See also* Pa.R.C.P. 404 ("Service Outside the Commonwealth"— indicating that service may be made outside the Commonwealth by mail in the manner provided for in Rule 403). Finally, Pa.R.C.P. 405 ("Return of Service") requires that a return of service "set forth the date, time, place and manner of service, the identity of the person served and any other facts necessary for the court to determine whether proper service has been made." Pa.R.C.P. 405(b).

¶ 27 Our review of the record in this case reveals the following. In response to Aquilino's pre-complaint discovery inquiries to the Archdiocese including the question, "[w]here is Father Michael D'Onofrio currently[,]" the Archdiocese responded, "[t]he last known address of Father Michael Donofrio [sic] is [the Peruvian address]." *See* Letter from the Archdiocese's counsel to Aquilino's counsel, 4/11/03, at 2. Subsequent to receiving this information, Aquilino filed his complaint, on April 28, 2003. In serving the complaint upon Father D'Onofrio, Aquilino properly relied upon Pennsylvania's long-arm statute, 42 Pa.C.S. § 5323 and Pa.R.C.P. 404.

¶ 28 Aquilino utilized Federal Express to deliver the complaint to the Peruvian address, which had been provided by the Archdiocese. Federal Express requires a signature to evince delivery. The record reveals that service by Federal Express at

the Peruvian address occurred on July 18, 2003, was accepted by "Recept/Frnt desk[,]" who signed for it by "Stamp."

¶ 29 Additionally, the Archdiocese produced Father D'Onofrio's personnel file and "Canon 489" file to Aquilino. These documents indicated Father D'Onofrio's address as the Peruvian address. The "Priest Data Profile" submitted with these documents is dated February 19, 2003, and it indicated that Father D'Onofrio was released to outside service at the mission located at the Peruvian address. A memo in the file, dated March 3, 2003, revealed that Monsignor William Lynn (Monsignor) and Reverend Vincent F. Welsh held a telephone conversation with Father D'Onofrio on March 3, 2003. In that conversation, the Monsignor informed Father D'Onofrio about the allegations of sexual abuse made against him by Aquilino and the pendency of the lawsuit. Despite Father D'Onofrio's denial of the allegations, the Monsignor informed Father D'Onofrio that the Archdiocese had to inform the Philadelphia District Attorney's Office and the bishop in Peru of the allegations.

¶ 30 On April 11, 2003, the Archdiocese sent at letter to Father D'Onofrio at the Peruvian address. The letter from the Monsignor reiterated what was said in the telephone conversation and requested that Father D'Onofrio return to Philadelphia as soon as possible so that he and the Archdiocese could respond to the allegations. The Monsignor indicated in the letter that he asked the bishop in Peru to relieve Father D'Onofrio of his duties so he could return to Philadelphia, requested that Father D'Onofrio respond to the letter when received, and requested that Father D'Onofrio inform the Monsignor as to when he would return to Philadelphia.

¶ 31 Based on this information, Judge Younge properly concluded that Father D'Onofrio's residence was the Peruvian ad-

dress at the time of service. Although Father D'Onofrio contests this finding on appeal, he fails to state where his residential address was at the relevant time. Father D'Onofrio never appeared before the court, even after the default judgment was entered against him. He merely submitted an affidavit, dated June 14, 2004, notarized in Peru, attesting only that he had not lived at the Peruvian address since 1996 and that at the time the complaint was served, his "residence was in Lima, Peru." Affidavit of Father D'Onofrio, 6/14/04. In other documents filed with the court, however, he asserted only that he was receiving treatment for prostrate problems in Lima at the time the complaint was served, but did not indicate where he resided. *See, e.g.,* Father D'Onofrio's brief at 6 (stating only that at the time of service Father D'Onofrio was in Lima receiving prostate treatment and that he had not resided at the Peruvian address since 1996, but failing to indicate where he did reside since then or presently). As Judge Younge noted:

> In his motions to have the default judgment set aside, [Father D'Onofrio] has come forward with no evidence other than an affidavit attesting to the fact that the Peruvian address was incorrect and a doctor's note stating that [Father D'Onofrio] received treatment in Lima, Peru on July 2 and 22, 2003. [Father D'Onofrio's] attorney entered an appearance on or about May 10, 2004 and filed a Post–Trial Motion and a Petition to Open or Strike. This attorney was not authorized to accept service of process on [Father D'Onofrio's] behalf. This Court held a hearing on these motions on July 20, 2004 and did not rule on these motions for over a month after the hearing. Despite this delay, [Father D'Onofrio] did not return to Philadelphia to appear at the hearing or provide de-

position testimony of his whereabouts. [Father D'Onofrio] produced no evidence of his residence at the time of ... service to challenge Philadelphia Archdiocese records stating that he was at the Peruvian address.

Trial Court Opinion (T.C.O.), 1/5/05, at 6. The record thus establishes that Father D'Onofrio resided at the Peruvian address at the time of service.

¶ 32 Father D'Onofrio further contends, however, that service was not accepted by his authorized agent. The record indicates, however, that the receptionist at the front desk of the Peruvian address signed for and accepted service of the complaint. Rule 402(a)(2)(ii) permits acceptance of service "at the residence of the defendant to the clerk ... of the hotel, inn, apartment house, boarding house or other place of lodging at which he resides;" and Rule 402(a)(2)(iii) permits acceptance of service "at any office or usual place of business of the defendant to his agent or to the person for the time being in charge thereof." The mission was Father D'Onofrio's residence and, most likely, his place of business. Although it is not clear that the receptionist at the front desk was the person who received mail on behalf of residents of the mission, there is equally no indication to the contrary, thus preventing us from concluding that there is a fatal defect on the face of the record. Judge Younge did not err by refusing to strike the default judgment.

■■■■ ¶ 33 Father D'Onofrio also argues that Judge Younge should have opened the default judgment.

A petition to open a judgment ... is an appeal to the court's equitable powers and is a matter of judicial discretion. In considering a petition to open a judgment, the court may consider matters *dehors* the record. Therefore, a petition to open a judgment is the proper method of seeking relief from a judgment where the irregularity of the judgment is predicated upon matters outside of the record.

*Cargitlada,* 837 A.2d at 550 (citations omitted). "To open a default judgment, a party must: (1) promptly file a petition to open judgment; (2) provide a meritorious defense; and (3) offer a legitimate excuse for the delay in filing a timely answer. Whether an excuse is legitimate is not easily answered and depends upon the specific circumstances of the case." *Reid,* 856 A.2d at 160 (citations and quotation marks omitted). Based on the above discussion, we conclude that Judge Younge did not abuse his discretion by refusing to open the default judgment. As Judge Younge stated, Father D'Onofrio's "argument of defective service of process was in itself inadequate and, as such, does not state a reasonable excuse for failing to respond to the Complaint in this matter." T.C.O., 1/5/05, at 7. We perceive no abuse of discretion.

¶ 34 Finally, we are reminded that our task is to "examine the entire record for any abuse of discretion, reversing only where the trial court's findings are inconsistent with the clear equities of the case." *Reid,* 856 A.2d at 159. The equities mandate that Father D'Onofrio not be rewarded for his attempts to evade service and for failing to return to Philadelphia, despite the Archdiocese's repeated requests that he do so, to face the allegations against him.

¶ 35 For the foregoing reasons, we affirm the judgment against Father D'Onofrio, and we affirm the judgment on the pleadings in favor of the Archdiocese and the Parish.

¶ 36 Judgment affirmed.