# Harris v. Diocese of Scranton

C.P. of Lackawanna County, no. 05 CV 152.

*Jay N. Abramowitch, Kenneth Millman* and *Richard M. Serbin,* for plaintiff.
*James E. O'Brien Jr.,* for defendants.

NEALON, *J.,* April 19, 2006—The Diocesan defendants have filed a motion for judgment on the pleadings in this civil action brought by a 57-year-old plaintiff who alleges that he was sexually abused in 1961 by a priest who died in 1974. The Diocesan defendants maintain that this suit is barred by the two-year statute of limitations governing personal injury claims, whereas the plaintiff contends that the Diocesan defendants are estopped from asserting that defense by virtue of the fraudulent concealment doctrine. Since the plaintiff has not identified an affirmative independent act of concealment by the Diocesan defendants upon which the plaintiff justifiably relied in forgoing pursuit of potential claims for more than 40 years, his claims are barred by the applicable limitations period. Consequently, the Diocesan defendant's motion for judgment on the pleadings will be granted.

## I. FACTUAL BACKGROUND

Plaintiff Thomas J. Harris of New York City commenced this action on January 13, 2005, asserting causes of action against the Diocese of Scranton, Bishop James C. Timlin and Bishop Joseph F. Martino (Diocesan defen-

dants) for common-law negligence, breach of fiduciary duty, "failure to provide a safe and secure environment," negligent supervision, negligent misrepresentation, "failure to protect against foreseeable risks," "duty to warn of unreasonable risk of harm," "use of improper persons as agents," "use of incompetent persons," fraudulent concealment, "intentional failure to supervise," and "intentional failure to warn." (Dkt. entry no. 3, ¶¶104-188.) Harris alleges that when he was a 12-year-old parishioner of St. Therese's Church in Shavertown, Luzerne County, he was sexually abused by Father Francis Brennan.[1] (*Id.,* ¶¶1, 7, 26.) The sexual assaults reportedly occurred in 1961 at a drive-in theatre, in "Father Brennan's rectory bedroom where [Harris] spent the night," and in New York City hotels where they stayed together. (*Id.,* ¶¶29-35.)

Harris avers that sometime during the 1961 school year, he reported the abuse to Father Michael Rafferty during confession, and Father Rafferty thereafter met with Harris "for counseling in his office at Gate of Heaven parochial school where [Harris] was a student." (*Id.,* ¶¶45-46.) In early 1962, "Father Rafferty went to [Harris'] residence to meet with [Harris'] parents, at which time he detailed to them the sexual abuse [Harris] endured at the hands of Father Brennan and expressed concerns for [Harris'] safety and well being." (*Id.* ¶47.) After Father Rafferty declined Mrs. Harris' request that he report the incidents to Bishop Jerome D. Hannan, Mrs. Harris "told

---

1. When considering the merits of a motion for judgment on the pleadings, the court must accept as true all well pleaded averments of fact contained in the non-moving party's pleadings and any documents attached thereto. *Maryland Casualty Company v. Odyssey Contracting Corporation,* 894 A.2d 750, 753 (Pa. Super. 2006).

Father Rafferty that she would report it to Bishop Hannan herself." (*Id.,* ¶¶48-49.)

Harris contends that his mother authored "a letter to Bishop Hannan reporting Father Brennan's sexual abuse" and that his "father hand-delivered this letter to Bishop Hannan." (*Id.,* ¶¶50-51.) Bishop Hannan allegedly read the letter in the presence of Harris' father, "discussed its contents with him and provided assurances that Father Brennan would be 'taken care of . . .' in an appropriate way." (*Id.,* ¶52.) According to Harris, he and his parents were thereby led to believe that "Father Brennan would be punished for his abuse of [Harris] and [that] Father Brennan would be reported to the proper law enforcement authorities." (*Id.,* ¶53.)

Harris maintains that "[d]espite the representations of Bishop Hannan, Father Brennan did not receive any punishment from Bishop Hannan or any other representative of the Diocese for his abuse of [Harris]." (*Id.,* ¶54.) Instead, "Father Brennan remained active as a priest assigned to St. Therese's until he was assigned to Marian Convent in Marywood." (*Id.,* ¶36.) Harris asserts that, "at the time of Father Brennan's transfer, the Diocesan defendants purposely misrepresented the reason for his transfer, and publicly set forth in the parish bulletin information regarding Father Brennan's leaving St. Therese's calculated to conceal from all parishioners, including [Harris] and his parents, as well as the public in general, the true reason for his removal from the parish."[2] (*Id.,* ¶70.) Father Brennan "remained at Marian

2. Harris' complaint identifies Bishop Timlin, Bishop Martino and the Diocese of Scranton as "the Diocesan defendants." (*Id.,* ¶¶2-4.) As the complaint indicates, Bishop Timlin served as the Bishop for the Diocese of Scranton from 1984 until his retirement in 2003, at which

Convent until approximately 1970, at which time he was assigned to the parish of St. Maria Goretti," where he served as a priest "until he died in 1974." (*Id.*, ¶¶37-38.) Harris alleges that the "Diocesan defendants engaged in affirmative acts of concealment" that misled him "into believing that he had not been harmed by the Diocese or its leaders, thereby relaxing his vigilance as to pursuing these claims." (*Id.*, ¶¶55-56.)

With regard to the timeliness of Harris' claims, Harris argues that "[t]he Diocesan defendants have systematically concealed the danger" presented by Father Brennan and "offending clerics" by allowing them unrestricted access to minors, offering misleading explanations for their transfer, removal or retirement, and privately assuring that the problem would be "taken care of" by the Diocese. (*Id.*, ¶58.) Harris posits that upon discovering sexual misconduct by priests, the "Diocesan defendants systematically concealed said knowledge, failed to report the misconduct to authorities and prevailed upon others not to report said misconduct to law enforcement officials . . . ." (*Id.*, ¶62.) As a result, Harris submits "that the Diocesan defendants actively misled [Harris] into incorrectly believing that he had not been harmed by Father Brennan despite the fact that they knew or should have known otherwise." (*Id.*, ¶77.)

On February 27, 2004, the National Review Board for the Protection of Children and Young People issued "A

---

Diocese of Scranton from 1984 until his retirement in 2003, at which time he was replaced by Bishop Martino. (*Id.*, ¶¶3-4.) Thus, although Bishop Timlin and Bishop Martino are named as Diocesan defendants in this lawsuit, neither was involved with the transfer of Father Brennan to the Marian Convent in the 1960s or the drafting of the parish bulletin at issue.

Report on the Crisis in the Catholic Church in the United States," which concluded that the Catholic Church leadership in the United States failed to properly address, investigate and prevent "the problem of pedophilia among its priests . . . ." (*Id.,* ¶86.) Harris contends that "[o]n or about February 28, 2004, the Diocese of Scranton publicly released information for the first time revealing that allegations of sexual abuse of children had been reported against 25 priests of the Diocese . . . during the period from 1950 to 2002. (*Id.,* ¶87.) Harris does not aver that Father Brennan was one of the 25 priests referenced in the report, nor does he allege how many, or if any, of those 25 reports of abuse were found to be valid. (See Transcript of Proceedings (T.P.) on 2/28/06, pp. 23-24, 35-36.) Nevertheless, Harris maintains that "[p]rior to the aforesaid disclosures, [Harris] did not know, nor did he have any reason to know, that he had a cause of action against Diocesan defendants for causing tortious injury to him . . . ." (*Id.,* ¶88.) Harris further asserts that "[t]he injuries that [Harris] sustained as a result of the actions of Diocesan defendants could not have been discovered by him earlier, despite the most diligent investigation, due to Diocesan defendants' fraudulent concealment of their active involvement in protecting parish priests known to them to be child molesters, including Father Brennan." (*Id.,* ¶90.)

In their answer and new matter, the Diocesan defendants assert that this suit "is barred by the applicable statute of limitations" and aver:

"[Harris] has acknowledged that he was aware of the alleged acts allegedly perpetrated by Father Brennan on him; was in therapy for the condition caused by the alleged acts; and did nothing until over 30 years after the

death of Father Brennan. The allegations in [Harris'] complaint list acts that were committed approximately 35-40 years ago and fail in any way under any Pennsylvania statutory or case law to be considered. No tolling of the statute of limitations in this case is recognized under Pennsylvania law." (Dkt. entry no. 11, p. 21.)

After Harris filed a reply to new matter asserting the discovery rule and the fraudulent concealment doctrine (*id.*, no. 9, ¶2), the Diocesan defendants filed a motion for judgment on the pleadings on November 9, 2005. (Dkt. entry no. 11.) The Diocesan defendants argue that Harris' claims are barred by the two-year statute of limitations period set forth in 42 Pa.C.S. §5524 and Pennsylvania case law construing the fraudulent concealment doctrine. (Dkt. entry no. 12.) Since Bishop Hannan, Father Brennan and Father Rafferty are all deceased, the Diocesan defendants submit that Harris' 44-year delay in filing this suit has severely prejudiced the Diocesan defendants' ability to defend this case.[3] (T.P. 2/28/06, pp. 12-13.)

Although Harris originally asserted in his pleadings that the statute of limitations was tolled by the discovery rule, he later withdrew that contention at the time of oral argument. (T.P. 2/28/06, pp. 18-19.) While acknowledging that the Superior Court has previously rejected tolling arguments predicated upon systemic concealment by Diocesan defendants in clerical pedophilia cases, Harris maintains that Bishop Hannan's alleged statement that Father Brennan would be "taken care of" distinguishes

---

3. The pleadings do not indicate whether Harris' parents, who were allegedly involved with the above-referenced discussions in 1961 and 1962, are still living and available to testify.

the instant case from that decisional precedent. (*Id.*, pp. 21-22.) Harris argues that the fraudulent concealment doctrine estops the Diocesan defendants from raising the statute of limitations until such time as the Diocesan defendants publicly acknowledge: (1) that Father Brennan sexually abused Harris; and (2) that Bishop Hannan and the Diocese of Scranton did not "take care of" Father Brennan as allegedly promised in 1962. (*Id.*, pp. 29-31, 33.) Since the Diocesan defendants have not publicly admitted such liability in this matter, Harris asserts that the two-year statute of limitations has not even begun to run in this case. (*Id.*, pp. 31-33.)

## II. DISCUSSION

### (A) *Standard of Review*

A motion for judgment on the pleadings is similar to a demurrer, *Consolidation Coal Company v. White,* 875 A.2d 318, 325 (Pa. Super. 2005), and may be granted "only where the pleadings demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *In re Weider,* 895 A.2d 11, 14 (Pa. Super. 2006). In making that determination, the court must accept as true all well-pleaded allegations in the complaint and consider against the non-moving party only those facts that [s]he specifically admits. *Odyssey Contracting Corporation, supra.* However, "[n]either party can be deemed to have admitted either conclusions of law or unjustified inferences." *Wilcha v. Nationwide Mutual Fire Insurance Company,* 887 A.2d 1254, 1258 (Pa. Super. 2005); *Consolidation Coal Company,* 875 A.2d at 326. If it is clear that the statute of limitations has expired in a clerical pedophilia case, a

motion for judgment on the pleadings may be granted on that basis. See *e.g., Aquilino v. Philadelphia Catholic Archdiocese,* 884 A.2d 1269 (Pa. Super. 2005); *Baselice v. Franciscan Friars Assumption B.V.M. Province Inc.,* 879 A.2d 270 (Pa. Super. 2005), *appeal denied,* 586 Pa. 733, 891 A.2d 729 (2005); *Meehan v. Archdiocese of Philadelphia,* 870 A.2d 912 (Pa. Super. 2005), *appeal denied,* 584 Pa. 719, 885 A.2d 985 (2005), *reargument denied* (Nov. 22, 2005).

### (B) *Statute of Limitations*

The statute of limitations requires aggrieved individuals to bring their claims within a certain time of the injury, so that the passage of time does not result in the loss or impairment of evidence and damage the defendant's ability to adequately defend against the claims made. *Dalrymple v. Brown,* 549 Pa. 217, 223, 701 A.2d 164, 167 (1997); *Lesoon v. Metropolitan Life Insurance Co.,* 898 A.2d 620, 626 (Pa. Super. 2006). It is undisputed that Harris' tort claims for intentional, fraudulent and negligent conduct are subject to the two-year statute of limitations set forth in 42 Pa.C.S. §5524.[4] See

---

4. The Minor Tolling Statute was amended in 2002 to extend the statute of limitations applicable to certain childhood sexual abuse claims (sexual intercourse, deviate sexual intercourse or indecent contact) which result from forcible compulsion or the threat of forcible compulsion. Section 5533(b)(2)(i) of the Judicial Code became effective on August 27, 2002 and provides that "[i]f an individual entitled to bring a civil action arising from childhood sexual abuse is under 18 years of age at the time the cause of action accrues, the individual shall have a period of 12 years after attaining 18 years of age in which to commence an action for damages regardless of whether the individual files a criminal complaint regarding the childhood sexual abuse." 42 Pa.C.S. §5533(b)(2)(i). However, section 3 of the Act of June 28,

*Aquilino,* 884 A.2d at 1275; *Baselice,* 879 A.2d at 275; *Meehan,* 870 A.2d at 919. In Pennsylvania, "the relevant statute of limitations begins to run as soon as the right to institute and maintain a suit arises, which generally is when the injury was inflicted." *Drelles v. Manufacturers Life Insurance Company,* 881 A.2d 822, 831 (Pa. Super. 2005) (citing *Fine v. Checcio,* 582 Pa. 253, 266, 870 A.2d 850, 857 (2005)). Mistake, misunderstanding or lack of knowledge by the plaintiff does not toll the running of the statute of limitations. *Dalrymple, supra; Aquilino,* 884 A.2d at 1275; *Meehan,* 870 A.2d at 919. "Once a cause of action has accrued and the prescribed statutory period has run, an injured party is barred from bringing his cause of action." *Fine, supra; Drelles, supra.*

The Diocesan defendants maintain that since Harris' alleged injuries were sustained in 1961 and Bishop Hannan's statement was purportedly made in 1962, the two-year statute of limitations expired more than 40 years prior to the filing of this action in 2005. The Diocesan defendants note that since the only witnesses who could testify on their behalf died more than 30 years ago, Harris' four decade delay in filing suit has severely prejudiced their ability to defend this case. Harris counters that he is not seeking to recover damages from Father Brennan or his estate, and instead is asserting independent causes of action against the Diocesan defendants,

---

2002, P.L. 518, no. 86 states that the 2002 amendment "shall not be applied to revive an action which has been barred by an existing statute of limitations on the effective date of this Act." Since Harris reached 30 years of age in 1979 and section 5533(b)(2) cannot be applied retroactively to revive his claims, see *Baselice,* 879 A.2d at 274 n.1, the 2002 amendment does not afford Harris relief from the Diocesan defendants' statute of limitations defense.

which are timely under the fraudulent concealment exception to the statute of limitations.

## (C) *Fraudulent Concealment Doctrine*

The applicable limitations period may be tolled or extended by virtue of the discovery rule or the fraudulent concealment doctrine. The discovery rule is distinct from the fraudulent concealment doctrine and operates to toll the statute of limitations during the period that the plaintiff's injury or its cause was neither known nor reasonably knowable to the plaintiff. *Gustine Uniontown Associates Ltd. v. Anthony Crane Rental Inc.,* 892 A.2d 830, 835 n.2 (Pa. Super. 2006). The separate doctrine of fraudulent concealment estops the defendant from invoking the statute of limitations if, through fraud or concealment, the defendant caused the plaintiff to relax his/her vigilance or deviate from his/her right of inquiry into the facts. *Fine,* 582 Pa. at 270-71, 870 A.2d at 860; *Drelles,* 881 A.2d at 832 n.6. Harris no longer contends that the discovery rule applies in this matter; rather, he asserts that the fraudulent concealment doctrine precludes the Diocesan defendants from invoking the statute of limitations. (T.P. 2/28/06, pp. 18-19.)

The fraudulent concealment doctrine does not demand fraud in the strictest sense encompassing an actual intent to deceive, but instead requires fraud in the broadest sense, which includes an unintentional deception. *Fine,* 582 Pa. at 271, 870 A.2d at 860; *Meehan,* 870 A.2d at 921. However, mere mistake, misunderstanding or lack of knowledge does not suffice and will not operate to estop the defendant from asserting the statute of limitations. *Aquilino,* 884 A.2d at 1278; *Baselice,* 879 A.2d at 278. "[I]n order for fraudulent concealment to toll the

statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiff justifiably relied." *Aquilino, supra; Baselice, supra; Meehan, supra; Kingston Coal Company v. Felton Mining Company Inc.,* 456 Pa. Super. 270, 284, 690 A.2d 284, 291 (1997). The party asserting estoppel under the fraudulent concealment doctrine has the burden of proving such fraud or concealment by "clear, precise and convincing" evidence. *Fine, supra; Aquilino, supra; Baselice, supra; Meehan, supra.*

Moreover, the standard of reasonable diligence, which is applied to the running of the statute of limitations when tolled under the discovery rule, also applies when a party is seeking to extend the limitations period under the fraudulent concealment exception. *Fine,* 582 Pa. at 271, 870 A.2d at 861; *Drelles,* 881 A.2d at 832 n.6. Hence, "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." *Fine,* 582 Pa. at 272, 870 A.2d at 861. Stated otherwise, "[a] person asserting a claim 'is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period.' " *Baselice,* 879 A.2d at 275; *Meehan,* 870 A.2d at 919.

The Superior Court holdings in *Meehan* and its progeny provide guidance as to the type and degree of evidence required for a plaintiff in a clerical pedophilia case to extend the statute of limitations under the fraudulent concealment doctrine. Not unlike Harris, the plaintiffs in *Meehan* advanced causes of action for "negligence, negligence per se and failure to warn, negligent supervi-

sion and failure to supervise, and fraudulent concealment and failure to provide a secure environment," and charged that the Archdiocese of Philadelphia "engaged in fraudulent conduct with regard to offending priests and nuns by providing known child abusers with unrestricted access to minors, providing child abusers with unrestricted use of church properties, announcing false reasons for re-assignments of child abusers, promoting child abusers within the church hierarchy, falsely listing child abusers' status in official directories, transferring child abusers without notifying parishioners of their history, and allowing child abusers to honorably retire." [5] *Meehan,* 870 A.2d at 918. The plaintiffs in *Meehan* similarly "claim[ed] that they did not discover this pattern of conduct until 2002 when the Archdiocese of Philadelphia acknowledged allegations of sexual abuse against some of its priests, and the president of the United States Conference of Catholic Bishops published statements regarding the Catholic Church's response to the victims of clergy misconduct." *Id.* The *Meehan* "plaintiffs contend[ed] that the general and systemic conduct of the Archdiocese of Philadelphia constitute[d] an affirmative act under the doctrine of fraudulent concealment, which therefore require[d] a jury determination and the tolling of the statute of limitations." *Id.* at 921-22.

In addressing the plaintiff's duty to exercise reasonable diligence in attempting to discover the plaintiff's injury and its cause, the *Meehan* court reasoned that "[t]he child abuse is the injury in this matter, not the alleged

---

5. The attorneys who represent Harris in this litigation also represented the plaintiffs in *Baselice* and *Meehan.* See *Baselice,* 879 A.2d at 273; *Meehan,* 870 A.2d at 916.

cover-up by the Archdiocese (otherwise, any member of the Catholic Church could conceivably bring suit against the Archdiocese, absent any abuse, alleging injury from the Archdiocese's general conduct)." *Id.* at 920. Finding that the plaintiffs had failed to satisfy the reasonable diligence standard, the Superior Court concluded:

"Here, the plaintiffs knew they were injured, knew the identity of the primary cause of their injury, knew their abusers were employees of the Archdiocese of Philadelphia, and knew the abuses took place on church property, yet the plaintiffs conducted no investigation into any cause of action against their abusers or into any other aspect of the matter. It is undisputed that the plaintiffs were aware that the Archdiocese employed their abusers and that the abuses all occurred on church property. These facts alone were sufficient to put the plaintiffs on notice that there was a possibility that the Archdiocese had been negligent. Neither the plaintiffs' lack of knowledge of the Archdiocese's conduct, nor the plaintiffs' reluctance, as members of the Catholic Church, to investigate the possible negligence of the Archdiocese of Philadelphia after having been abused by one of its priests or nuns, tolls the statute of limitations when the plaintiffs had the means of discovery but neglected to use them." *Id.* at 921.

With regard to the requirement of an affirmative independent act of concealment, the *Meehan* court noted that the Archdiocese "defendants never concealed from any of the plaintiffs the fact of the injury itself[, n]or d[id] the plaintiffs allege that they were lied to by the Archdiocese with regard to the identity of their abusers or their abusers' place within the Archdiocese, which if relied upon, would have caused them to suspend pursuit

of their claims." *Id.* at 922. By way of obiter dictum, the Superior Court provided an example of the type of conduct which would be tantamount to fraudulent concealment and remarked:

"Had the plaintiffs (sometime after the abuse but before the running of the statute of limitations) questioned the Archdiocese about their abusers (for example, questions about their abusers' current location or history within the church), and had the Archdiocese affirmatively and independently acted in response to the plaintiffs' inquiries so as to mislead the plaintiff into forgoing their suits, the fraudulent concealment exception would later allow the plaintiffs' suits." *Id.*

The plaintiffs in *Meehan* argued that they had averred the requisite concealment since the "alleged abuser, Reverend Gallagher, disguised [his] illegal and immoral acts as sanctioned by God" and thereby caused the plaintiffs to relax their vigilance and deviate from their right of inquiry. *Id.* at 923. *Meehan* rejected that contention and held that "a defendant's general assurances that a situation or condition being experienced by the plaintiff is normal do not rise to the level of fraudulent concealment where the plaintiff's own common sense should inform him that he has been injured." *Id.* (quoting *E.J.M. v. Archdiocese of Philadelphia,* 424 Pa. Super. 449, 462, 622 A.2d 1388, 1395 (1993)). In so holding, the *Meehan* court stated that "to postpone the accrual of causes of action until the plaintiffs completed their investigation of all potential liability theories would destroy the effectiveness of the limitations period." *Meehan,* 870 A.2d at 922-23.

Less than four months later, a separate panel of the Superior Court reached an identical conclusion in

*Baselice. Baselice* asserted the same causes of action and tolling arguments that are being advanced by Harris in the case sub judice. See *Baselice,* 879 A.2d at 274-75. Confirming again that the operative "injury" is "the underlying child abuse" in clerical pedophilia cases, *id.* at 277, the *Baselice* court noted that *Baselice* had the means of discovering his potential claims against the Archdiocese of Philadelphia and held:

"Here, appellant knew he was injured, knew the identity of the primary cause of his injury, and knew his abuser was an employee of the Archdiocese of Philadelphia, yet appellant conducted no investigation into any cause of action against Father Newman or into any other aspect of the matter. These facts alone were sufficient to put appellant on notice that there was a possibility that the Archdiocese had been negligent." *Id.* at 278.

Since *Baselice* did not allege that the Archdiocese had lied about the identity or location of his purported abuser, the Superior Court found as a matter of law that the fraudulent concealment exception did not extend the limitations period. *Id.* at 279. Quoting from *Meehan,* the *Baselice* court reasoned that "for a cause of action to accrue, the entire theory of the case need not be immediately apparent . . . as soon as appellant became aware of the alleged abuse, he should also have been aware that appellees, as the priest's employers were potentially liable for that abuse." *Id.* (quoting *Meehan,* 870 A.2d at 922).

More recently, in *Aquilino, supra,* an alleged victim of sexual abuse by a priest sought to invoke the fraudulent concealment exception based upon his abuser's affirmative conduct in "telling Aquilino that he would not

go to heaven if he told anyone about the abuse, and saying such things as it was 'God's secret' and 'this is the way to heaven.'" *Aquilino,* 884 A.2d at 1274. Aquilino also alleged active complicity by the Archdiocese of Philadelphia and "contended that the Archdiocese and the parish deliberately concealed sexual abuse by priests including Father D'Onofrio, whom they later transferred from parish to parish and, eventually, to Peru." *Id.* Although Aquilino made a specific assertion regarding the Archdiocese's handling of the offending priest, the Superior Court "reject[ed] Aquilino's fraudulent concealment argument on the basis of *Meehan* and *Baselice.*" *Id.* at 1279. The *Aquilino* court concluded that "[d]espite this more specific assertion with regard to the Archdiocese's handling of Father D'Onofrio," the fraudulent concealment exception was nonetheless inapplicable since Aquilino did not "assert that he questioned the Archdiocese/parish about 'his abuser's current location or history with the church'" and "that the Archdiocese/parish responded by misleading him into forgoing his suit against them." *Id.*

Although the jury must generally determine what remarks were actually made by a defendant to a plaintiff, it is for the court to decide whether those established remarks constitute fraudulent concealment. See *Fine,* 582 Pa. at 273, 870 A.2d at 862; *Drelles, supra.* Cf. *E.J.M., supra* (priest's assurances that acts of sexual abuse upon minor were necessary for minor's "spiritual growth and preparation for ordination" and "would rid [the minor] of pride unpleasing to God" were "insufficient to constitute fraudulent concealment."). In the case at hand, the Diocesan defendants have filed a motion for judgment on the pleadings, and as a result, all well-pleaded allega-

tions contained in Harris' complaint must be accepted as true for purposes of deciding that motion. Therefore, it must be determined whether Bishop Hannan's alleged statement that Fr. Brennan would be "taken care of" is sufficient under *Meehan, Baseline* and *Aquilino* to estop the Diocesan defendants from invoking the statute of limitations.

### (D) *Affirmative Independent Act of Concealment and Plaintiff's Justifiable Reliance*

Harris contends that Bishop Hannan's alleged comment that Father Brennan would be "taken care of" establishes an affirmative independent act of concealment upon which he justifiably relied. Harris ostensibly interpreted that remark as meaning that Father Brennan would be reported to law enforcement authorities and punished for his abuse. (Dkt. entry no. 3, ¶¶52-53.) Harris submits that this purported statement by Bishop Hannan led Harris to believe that he had not been injured by the Diocesan defendants and caused him to forgo inquiry into possible tortious conduct by the Diocese.[6] (*Id.,* ¶¶55-56, 77.) Although Harris originally averred that the national

---

6. The gravamen of Harris' argument is that Bishop Hannan's alleged statement caused Harris to relax his vigilance and refrain from investigating potential claims against the Diocese. However, in his "Brief contra-motion of defendant," Harris appears to argue the converse by asserting that the Diocese's failure to report Father Brennan, rather than the promise to report him, caused Harris to forego any claims. Specifically, Harris asserts in his brief that, "because the Diocese failed to report Father Brennan's abuse of [Harris] to any law enforcement authorities, and instead transferred Father Brennan to various other assignments in order to hide him from [Harris], it caused [Harris] to forgo these claims until just recently." (Dkt. entry no. 15, p. 8.)

report dated February 27, 2004 and the Scranton Diocese's press release of February 28, 2004 triggered his inquiry and prompted this suit, but see *Meehan, supra,* (rejecting comparable argument), he posited at the time of oral argument that the two-year statute of limitations will not begin to run until the Diocesan defendants admit that Father Brennan sexually abused Harris and that Bishop Hannan and the Diocese of Scranton did not "take care of" Father Brennan as reportedly promised. (T.P. 2/28/06, pp. 29-33.)

Under the fraudulent concealment standard articulated in *Meehan, Baselice* and *Aquilino,* it is clear that Harris' allegations are insufficient to toll the statute of limitations for more than 40 years. Like the plaintiffs in those cases, Harris knew that he allegedly had been injured on church property and that Father Brennan was the person who committed the abuse. The Diocesan defendants did not conceal Father Brennan's alleged abuse from Harris or his parents and, to the contrary, Father Rafferty reported that information to Harris' parents. There is no allegation that Harris or his parents inquired about the putative abuser's identity, current location or history within the Church or that the Diocesan defendants furnished false information to them in response to those particular inquiries. Absent such an affirmative act of concealment regarding the commission of the abuse or the identity, location or history of Father Brennan, Harris cannot satisfy the fraudulent concealment criteria. See *Aquilino,* 884 A.2d at 1279; *Meehan,* 870 A.2d at 922.

Even assuming arguendo that Harris could establish an affirmative independent act of concealment by clear, precise and convincing evidence, Harris was not justified in relying upon any such concealment for four decades. It is

beyond dispute that Harris was aware of his alleged injury, *i.e.,* the sexual abuse, in 1961. In accordance with the reasonable diligence standard that governs the fraudulent concealment exception, see *Fine,* 582 Pa. at 272, 870 A.2d at 861, Harris should have known of the Diocese's possible liability at least 30 years prior to the filing of this suit. Harris contends that Bishop Hannan's representation that Father Brennan would be "taken care of" led him to believe that Father Brennan would be reported to law enforcement and punished for his abuse. However, by Harris' own admission, Father Brennan continued to remain active as a priest at St. Therese's, the Marian Convent and St. Maria Goretti throughout the 1960s and early 1970s. Hence, it was patently obvious to Harris and his parents that Father Brennan had not been prosecuted, punished or reported and that Bishop Hannan had not "taken care of" Father Brennan inasmuch as he continued to serve as a priest. As with the plaintiffs in *Meehan* and *Baselice,* "[t]hese facts alone were sufficient to put [Harris] on notice that there was a possibility that the [Diocesan defendants] had been negligent." *Baselice,* 879 A.2d at 278; *Meehan,* 870 A.2d at 921. Furthermore, common sense dictates that when Father Brennan died in 1974 without having been prosecuted or punished, Harris was no longer justified in relying upon Bishop Hannan's alleged assurance that Father Brennan would be "taken care of" by the Diocese. No facts have been alleged that would have caused a reasonably diligent person to refrain from exploring or pursuing possible claims against the Diocese for over 40 years.

Statutes of limitation "are designed to effectuate three purposes: (1) preservation of evidence; (2) the right of potential defendants to repose; and (3) administrative

efficiency and convenience." *Aquilino,* 884 A.2d at 1275; *Baselice,* 879 A.2d at 276; *Meehan,* 870 A.2d at 919. The effectiveness of the limitations period would be destroyed if the accrual of causes of action were postponed for decades until the plaintiff had subjectively completed his investigation of all potential theories of liability. See *Aquilino, supra* at 1278; *Baselice, supra* at 279; *Meehan, supra* at 922-23. Harris has simply not alleged facts which are sufficient to constitute an affirmative independent act of concealment upon which Harris justifiably relied until the 21st Century. Based upon the fraudulent concealment test enunciated in *Meehan, Baselice* and *Aquilino,* it is clear and free from doubt that Harris' claims against the Diocesan defendants are barred by the statute of limitations. Accordingly, the Diocesan defendants' motion for judgment on the pleadings will be granted.

## ORDER

And now, April 19, 2006, upon consideration of the motion for judgment on the pleadings filed by the defendants, the Diocese of Scranton, Bishop James C. Timlin and Bishop Joseph F. Martino, the memoranda of law submitted by the parties and the oral argument of counsel on February 28, 2006, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

(1) Defendants' motion for judgment on the pleadings is granted; and

(2) The Clerk of Judicial Records is directed to enter judgment in favor of the defendants, the Diocese of Scranton, Bishop James C. Timlin and Bishop Joseph F. Martino, and against the plaintiff, Thomas J. Harris.