**In re Robert M. FELLHEIMER, Debtor.**

**No. 03–33298bf.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 13, 2010.

**358**

Jonathan J. James, Philadelphia, PA, Robert W. Small, Abington, PA, for Debtor.

## MEMORANDUM

BRUCE FOX, Bankruptcy Judge.

Presently before me is a motion filed by Ms. Alice Overlander to reopen the debtor's closed bankruptcy case under 11 U.S.C. § 350(b) and Fed. R. Bankr.P. 5010. Ms. Overlander seeks to reopen this bankruptcy case in order to file an adversary proceeding to seek a declaration of nondischargeability of the movant's debt under 11 U.S.C. § 524(a)(2), (4) and to seek revocation of his chapter 7 discharge under 11 U.S.C. § 727(d).[1] Essentially, Ms. Overlander contends that the debtor, Mr. Robert Fellheimer, committed fraud in obtaining loans from her in 2000 and 2001, and did so while acting as her attorney. She further maintains that the debtor then concealed this fraud for many years, so that she took no action against him during the pendency of his bankruptcy case and for more than three years thereafter.

Mr. Fellheimer has filed an answer in opposition to this motion, denying therein that he committed any fraud against Ms. Overlander, either prior to or during his bankruptcy case, and further denying that any loans made to him occurred while he was acting in a fiduciary capacity to Ms. Overlander. He disputes taking any actions during his bankruptcy case to mislead Ms. Overlander into relinquishing her rights. He further maintains that there is no basis to revoke his discharge.

■ In addition, Mr. Fellheimer argues that there is no purpose to reopening his bankruptcy case because the ultimate relief sought by Ms. Overlander in this forum—revocation of discharge and determination of nondischargeability under

---

1. In her motion, Ms. Overlander asserts that were Mr. Fellheimer's discharge revoked, or her claim held to be nondischargeable, she would, presumably in Pennsylvania state court, "file claims against the Debtor for, *inter alia:* Fraud, Larceny, Breach of Fiduciary Duties, Breach of Contract, Professional Negligence, Conversion, Unjust Enrichment, the Intentional Infliction of Emotional Distress, and claims under the Pennsylvania Unfair Practices and Consumer Protection Law...." Motion, at 7 ¶ 28. She relies upon section 523(a)(16) as a basis for seeking revocation of a discharge.

Section 523(a)(16), however, concerns the nondischargeability of condominium, cooperative, and homeowners association fees; an issue not germane to the nature of the claim held by Ms. Overlander. In her post-hearing supplemental memorandum, Ms. Overlander may have realized her error, because she "relinquishe[d] her earlier reliance" upon section 523(a)(16). Overlander Supplemental Memorandum, at 1 n.1. She also withdrew her intention, were this case reopened, to raise issues against Mr. Fellheimer under section 523(a)(6). *Id.*

Ms. Overlander, however, does not expressly withdraw her intention to seek revocation of the debtor's discharge. Accordingly, I shall treat the instant motion as one in which Ms. Overlander is moving to reopen Mr. Fellheimer's closed case so as to seek nondischargeability relief under sections 523(a)(2)(A) and 523(a)(4). In addition, upon reopening, she would also seek to revoke the debtor's chapter 7 discharge, presumably relying upon section 727(d).

sections 523(a)(2) and (a)(4)—are barred by the relevant limitations periods.[2] As will be discussed below, Ms. Overlander counters that the limitations periods are not preclusive, owing to the doctrines of equitable tolling and promissory estoppel. Mr. Fellheimer rejoins that those equitable doctrines are not applicable to revocation and nondischargeability claims and, if they were, these doctrines should not apply, owing to Ms. Overlander's lack of diligence as well as unreasonable delay in raising her fraud issues before this court.

## I.

■ Section 350(b) of the bankruptcy code provides for the reopening of a bankruptcy case "to administer assets, to accord relief to the debtor, or for other cause." Whether to reopen a closed bankruptcy case is committed to the discretion of the bankruptcy court. *See, e.g., Donaldson v. Bernstein,* 104 F.3d 547, 551 (3d Cir.1997); *Judd v. Wolfe,* 78 F.3d 110, 116 (3d Cir.1996); *Matter of Case,* 937 F.2d 1014, 1018 (5th Cir.1991) ("This discretion depends upon the circumstances of the individual case and accords with the equitable nature of all bankruptcy court proceedings."); *Hawkins v. Landmark Finance Co.,* 727 F.2d 324 (4th Cir.1984); *Matter of Becker's Motor Transp., Inc.,* 632 F.2d 242, 245 (3d Cir.1980); *Urbanco, Inc. v. Urban Systems Streetscape, Inc.,* 111 B.R. 134 (W.D.Mich.1990).

■ In general, when a party in interest seeks to reopen a closed bankruptcy case the court should consider a variety of non-exclusive factors including: the length of time that the case has been closed, *see Matter of Case,* 937 F.2d at 1018; whether a non-bankruptcy forum, such as state court, has the ability to determine the dispute to be posed by the debtor were the case reopened, *see, e.g. In re Tinsley,* 98 B.R. 791 (Bankr.S.D.Ohio 1989); *In re E.A. Adams, Inc.,* 29 B.R. 227 (Bankr. D.R.I.1983); *In re Hepburn,* 27 B.R. 135 (Bankr.E.D.N.Y.1983); whether prior litigation in bankruptcy court implicitly determined that the state court would be the appropriate forum to determine the rights, post-bankruptcy, of the parties; whether any parties would be prejudiced were the case reopened or not reopened; the extent of the benefit which the moving party seeks to achieve by reopening; and (most germane here) whether it is clear at the outset that the moving party would not be entitled to any relief if the case were reopened. *See generally Arleaux v. Arleaux,* 210 B.R. 148, 149 (8th Cir. BAP 1997); *In re Rashid,* 2004 WL 2861872, at *5 (E.D.Pa.2004); *In re Carberry,* 186 B.R. 401, 402 (Bankr.E.D.Va.1995) (a bankruptcy court "should not reopen a bankruptcy case where it appears that to do so would be futile and a waste of judicial resources"); *In re Nelson,* 100 B.R. 905, 907 (Bankr.N.D.Ohio 1989):

> [T]he court will not grant a motion to reopen when no clear benefit is shown to creditors.... Because no benefit will inure to Debtors' estate or their creditors, Debtors' motion should be denied.

■ Moreover, "[t]he burden of demonstrating circumstances sufficient to warrant reopening a case is on the moving

2. A bankruptcy court has no jurisdiction over a dispute filed after a case is closed until it is reopened, because the outcome of that dispute cannot possibly have an effect upon the administration of the closed case. *See Cook v. Chrysler Credit Corp.,* 174 B.R. 321, 327 (M.D.Ala.1994); *Walnut Associates v. Saidel,* 164 B.R. 487, 491 (E.D.Pa.1994); *In re Brantley,* 1997 WL 74663, at *1 (Bankr.W.D.Ark.

1997) (holding that an adversary proceeding filed after a debtor was discharged and the bankruptcy case was closed is improper); *In re Cassidy,* 1995 WL 661244, at *3 (Bankr. N.D.Ga.1995). Thus, it is necessary to reopen this case in order to adjudicate Ms. Overlander's revocation of discharge or nondischargeability claims.

party." *In re Redcay*, 2007 WL 4270378, at *2 (Bankr.E.D.Pa.2007); *see, e.g., In re Gutches* 430 B.R. 342, 344 (Bankr.E.D.Pa. 2009).

■ Given that Mr. Fellheimer argues that there is no valid purpose in reopening this closed bankruptcy case in light of the limitations periods found in Fed. R. Bankr.P. 4007(c) and section 727(d), and given that it is usually inappropriate to determine the merits of an underlying fraud allegation in the context of a motion to reopen under section 350(b), *see Arleaux v. Arleaux*, 210 B.R. at 149,[3] I requested that the parties focus upon whether Ms. Overlander can now obtain any relief from this bankruptcy court were this case reopened. To that end, an evidentiary hearing was held over a two-day period.[4]

The following facts, as germane to the issue of reopening and the ability of Ms. Overlander to now seek her desired relief, were proven.[5]

## II.

### A.

In 1989, Ms. Overlander and her husband allegedly suffered personal injuries after exposure to Dursban, a termiticide. Ms. Overlander, now 63, purportedly suffered injuries including cognitive impairment, immune and pulmonary disorders, chemical sensitivity, peripheral neuropathies and liver disease. 1 N.T. at 35–36. Her husband died shortly after exposure to the termiticide. *Id.*

In June 1995, Ms. Overlander, individually and representing the estate of her husband, ultimately retained Mr. Fellheimer, an attorney, to represent her in both capacities in a toxic tort lawsuit she initiated in Pennsylvania. 1 N.T. at 56–57. Mr. Fellheimer had been practicing law since 1973. 1 N.T. at 103–04.

Using expert reports that supported Ms. Overlander's injury claims, in July 1997 Mr. Fellheimer obtained a $3.8 million settlement of the tort litigation. 1 N.T. at 36–37. In accordance with a previously signed retainer agreement, Ms. Overlander received about $1.5 million from the settlement proceeds; the balance was distributed for attorney's fees, expert fees, and court costs (and possibly distributed to other beneficiaries of the estate of Mr. Overlander).

---

**3.** Similarly, I will not consider, in the context of this motion to reopen, Ms. Overlander's allegations that Mr. Fellheimer violated various Rules of Professional Conduct in obtaining the loans from her. Moreover, while unethical conduct may in some instances be relevant regarding a claim for fraud, *see Raymark Industries, Inc. v. Stemple*, 1990 WL 72588, *24 (D.Kan.1990), an attorney may act unethically toward a client and yet do so in good faith, *see Prudential Ins. Co. of America v. Massaro*, 47 Fed.Appx. 618, 619 (3d Cir. 2002), precluding a finding of fraud. *See generally Raymark Industries, Inc. v. Stemple*, 1990 WL 72588 at *13 ("Although such an article may suggest unethical conduct on the part of Stemple, it does not reveal or suggest that the medical defendants' diagnoses were in any way fraudulently prepared[.]"); *id.*, at *24 ("[T]he above-referenced ethical viola-tions may not create a per se private cause of action against the attorney defendant[.]").

**4.** Citations to the notes of testimony will be in the form "1 N.T. at" and "2 N.T. at."

**5.** Ms. Overlander improperly attempted to supplement the record by attaching an affidavit to her post-hearing memorandum. This document cannot be considered, as Mr. Fellheimer had no opportunity to cross-examine the affiant on the facts asserted, nor offer rebuttal evidence. *See, e.g., In re Millman*, 2003 WL 716289, at *3 n. 12 (Bankr.E.D.Pa. 2003); *In re MacDonald*, 222 B.R. 69, 72 (Bankr.E.D.Pa.1998); *In re Midway Airlines, Inc.*, 221 B.R. 411, 462–63 (Bankr.N.D.Ill. 1998); *Matter of Holly's, Inc.*, 190 B.R. 297, 301 (Bankr.W.D.Mich.1995).

Shortly after Ms. Overlander's tort lawsuit was settled in 1997, Mr. Fellheimer, who was married, and Ms. Overlander began a romantic relationship. 1 N.T. at 37–38; 2 N.T. at 149; ex. P–10, Fellheimer deposition at 88.[6] The debtor's Statement of Financial Affairs reveals that a divorce decree was entered April 21, 2003.[7] *See also* 1 N.T. at 149.

A few years later, and while that relationship continued, in March of 2000, Mr. Fellheimer requested funds from Ms. Overlander. 1 N.T. at 38. Over the course of a year and a half, she wrote checks payable to him in amounts ranging from $15,000 to $50,000, and totaling at least $200,000.[8] *See* ex. P–1.[9] Although Ms. Overlander provided these funds to Mr. Fellheimer, although these transfers were considered by the parties to be loans, and although Ms. Overlander anticipated being repaid, there was no discussion or agreement as to a date of repayment or payment of interest. 1 N.T. at 43.

Mr. Fellheimer testified that at the time of borrowing these funds from Ms. Overlander he intended to repay her, but that he was unable to do so. 1 N.T. at 150. "Even after the last of the money was lent to me, I struggled for two additional years trying to pay it back." *Id.* It is agreed that no portion of the borrowed funds were ever repaid. The evidence is also clear that before taking action in this court in 2009 Ms. Overlander never demanded repayment.

In lending money to Mr. Fellheimer, Ms. Overlander testified that Mr. Fellheimer initially explained that he needed funds to litigate a tort case, referred to as the "Canoe" lawsuit. In other words, Ms. Overlander swore that she believed that her loan proceeds would be used by Mr. Fellheimer to represent a client in a contingent fee case and that he would repay her when it concluded, which she believed would be in a matter of months. 1 N.T. at 40, 72–73, 89. Mr. Fellheimer disagrees to a certain extent. He testified that most of the expenses for the Canoe litigation had already been paid by 2000 when he began borrowing from Ms. Overlander. 1 N.T. at 161–62. Instead, he testified that he told Ms. Overlander that he needed funds for his basic living expenses and office overhead, 2 N.T. at 19, and that winning the pending Canoe litigation presented the best prospect of being able to repay her. 1 N.T. at 161–62; ex. P–10, Fellheimer deposition, p. 108–109.

6. Mr. Fellheimer's marital status was known to Ms. Overlander from the beginning of their relationship. 1 N.T. at 38.

7. I may take judicial notice under Fed.R.Evid. 201 (incorporated into bankruptcy cases by Fed. R. Bankr.P. 9017) of the docket entries, as well as the bankruptcy schedules and other documents filed in this case, to the extent that statements in those documents would otherwise be admissible. *See generally Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi*, 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino*, 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); *see also In re Indian Palms Associates, Ltd.*, 61 F.3d 197 (3d Cir. 1995).

8. Ms. Overlander asserts that she made loans totalled $250,000, but could only find checks aggregating $200,000. Mr. Fellheimer's bankruptcy schedules disclosed a claim owed to Ms. Overlander at $250,000. For the purposes of this motion, the exact amount is not material.

9. The checks entered into evidence by Ms. Overlander are as follows:

| Date | Amount |
|---|---|
| March 2, 2000 | $25,000 |
| March 22, 2000 | 25,000 |
| April 28, 2000 | 25,000 |
| June 7, 2000 | 25,000 |
| November 1, 2000 | 50,000 |
| August 10, 2001 | 15,000 |
| September 4, 2001 | 15,000 |
| September 25, 2001 | 20,000 |

Ex. P–1.

In support of his then need for funds for personal expenses, Mr. Fellheimer testified that he was "desperate" and "depressed" during this period. 1 N.T. at 150, 151. His law partnership was dissolving. 1 N.T. at 150, 157. His marital assets were frozen and he was "tapped out" on a credit line. 2 N.T. at 19. His Statement of Financial Affairs also lists 10 separate lawsuits naming him as defendant, including a $10,000 judgment entered against him in December 2002, a pending foreclosure action, and a lawsuit seeking $55,000.

After the first two or three loans (totaling $50,000 to $75,000), at Mr. Fellheimer's suggestion Ms. Overlander met with a financial advisor, where she revealed having made loans to Mr. Fellheimer. 1 N.T. at 73–77. Ms. Overlander testified that the advisor, Mr. Brick, was "dismayed" by her loaning funds to Mr. Fellheimer. 1 N.T. at 74. This dismay, and the implicit recommendation to make no further loans, 1 N.T. at ·75–76, however, did not dissuade her from continuing to do so.

Although Ms. Overlander testified that she believed at least some of her loans were being used by Mr. Fellheimer to fund the Canoe litigation, she also acknowledged that she did not know precisely the reason he needed to borrow from her, nor the purpose for which those borrowed funds were being used. 1 N.T. at 89–90. She testified that it upset her that he had requested loans from her, but she was in love with him and sought to help him. 1 N.T. at 43. At some point prior to November 2000, she learned that the Canoe litigation was not going well. 1 N.T. at 42–43, 76–77. She nevertheless continued to lend Mr. Fellheimer money, but thereafter wrote "loan" in the memo section of the checks. 1 N.T. at 41–42. In testimony, she explained:

Q: Why did you do that [continue to loan him money]?

A: Mr. Fellheimer would come to me repeatedly and state that he was in a bind. But when he said he was in a bind, I wasn't sure what he meant. I thought he, perhaps, meant the Canoe [case]—he needed money for the appeal for Canoe. He never exactly expressed to me where my monies were going and I would constantly ask him why more money, why more money? He said don't badger me, just give me the money. I brought your [toxic tort] case home, didn't I?

Q: Okay, and did you trust him at this point?

A: I trusted him [im]plicitly. . . . I was in love with Mr. Fellheimer, at the time and I wanted to help him.

1 N.T. at 42–43; see 1 N.T. at 89 ("Q: Is it your testimony that he never gave you a reason for borrowing the money? A: He said he needed the monies. A: Did he tell you why he needed them? Q: Well, I thought it was to keep the office afloat."). Even after the last loan, she "wasn't sure" how the loans funds had been spent. 1 N.T. at 90.

Ms. Overlander was further upset to learn from the debtor's mother in late 2001 [10] that Mr. Fellheimer had also borrowed funds from his parents. Ms. Overlander testified that she was surprised that Mr. Fellheimer's parents had loaned him money since he had previously told her that his parents did not have the financial resources to do so. 1 N.T. at 62, 69. She acknowledges that this information caused her to "realize [ ] that he had lied." 1 N.T. at 62. Nevertheless, Ms. Overlander stat-

---

**10.** Mr. Fellheimer testified that he spoke with his mother about her conversation with Ms. Overlander sometime between September and December 2001.

ed that she "didn't realize I was not going to be repaid. I just felt that he was not being honest with me. I didn't know where the monies were going." 1 N.T. at 62–63. She also acknowledged that Mr. Fellheimer's mother had cautioned her about lending money to her son. 1 N.T. at 61. Ms. Overlander, upset by this information, then confronted Mr. Fellheimer about her conversation with his mother. 1 N.T. at 61–62. Despite her belief that she had been misled in lending him a substantial sum of money, Ms. Overlander testified that "he assured me constantly that I would be repaid," 1 N.T. at 69, and that she accepted those assurances.

In December 2001, Mr. Fellheimer closed his law firm office and moved in with his parents. 1 N.T. at 159; 2 N.T. at 21. Mr. Fellheimer still practiced law, having a few clients remaining, 1 N.T. at 159–160, but his practice was very limited from 2001 to 2005. 1 N.T. 103–104.

It appears that at some point after December 2001, Ms. Overlander and Mr. Fellheimer ended their relationship for a certain period. 1 N.T. at 172:

> There was a period of time between early 2002 and 2003 when Alice broke up with me and there [was] zero contact of any kind during that period of time. No telephone contact, no seeing each other. After 2003 we had an on and off relationship but we did see each other for the most part regularly.

On September 10, 2003, Mr. Fellheimer filed a voluntary petition in bankruptcy. His unsecured debt to Ms. Overlander was listed in his bankruptcy schedules in the amount of $250,000 as a "personal loan." His total scheduled unsecured debt was $963,896. He also disclosed as personal property on Schedule B: "*Canoe v. Meridian Bak [sic] & Jones*, contingency fee agreement in above matter," in the amount of $2,000,000; and he revealed accounts

receivable of about $10,000. His monthly income was reported on Schedule I as only $3,000, with average net business income of $1,081, and his monthly expenses on Schedule J were $2,909.

On December 17, 2004, Mr. Fellheimer received his chapter 7 discharge. Before October 22, 2004, the chapter 7 trustee collected approximately $103,000, constituting the debtor's interest in a referral fee from another attorney. National Penn Bank asserted a security interest in this referral fee, which security interest the trustee contested. That dispute was settled eventually, with National Penn Bank receiving $78,265 on its claim and the trustee receiving $25,000. The trustee then made distributions for administrative expenses and creditors with priority claims. No dividend was paid to unsecured creditors. The trustee's final report was approved and this case was closed on September 27, 2006.

### B.

Just prior to filing his chapter 7 bankruptcy case, Mr. Fellheimer telephoned Ms. Overlander to alert her to expect notification from the bankruptcy court in the near future. 1 N.T. at 45, 163. He testified that he told her the bankruptcy would discharge her debt "which meant that her debt would be wiped out and that I would no longer [be] under an obligation to pay it." 1 N.T. at 164. Both in her testimony and in her deposition, Ms. Overlander does not expressly deny that she was so informed by Mr. Fellheimer. *See* 1 N.T. at 78, 80; ex. D–3. Rather, Ms. Overlander testified that she had only a general understanding that someone in financial difficulty would file for bankruptcy, but not that a bankruptcy filing meant that Mr. Fellheimer would not repay the loans she made to him. She further stated that she did not understand what his bankruptcy

filing meant to her, and that he did not explain it to her. 1 N.T. at 78–79, 82. She also testified that Mr. Fellheimer later told her to disregard all notices she received about his bankruptcy filing, and not to worry about his case, as he would handle everything. 1 N.T. at 87–88, 92–93. Mr. Fellheimer denies making such statements. 1 N.T. at 166–67.

Ms. Overlander claims and Mr. Fellheimer denies that during the latter's bankruptcy case he told her he would repay her when he was financially recovered. 1 N.T. at 93–94, 170; 2 N.T. at 22. Moreover, Ms. Overlander considered him her lawyer for advice about the bankruptcy. 1 N.T. at 83–85, 87. She did not know whether he had bankruptcy expertise: she relied on him to tell her if he did not. 1 N.T. at 95–96.

Although Mr. Fellheimer informed Ms. Overlander of his bankruptcy filing and its effect upon her claim, and while Ms. Overlander states that she did not understand his statements to her, it is agreed that Mr. Fellheimer did not advise her that she should hire a bankruptcy lawyer:

Q: You didn't tell her to see a lawyer, did you?

A: Ms. Overlander did not ask for legal advice from me, nor did I give it. I never told her not to see an attorney.

Q: Well, isn't telling somebody who's a non-lawyer what a bankruptcy discharge is, isn't that giving them legal information, legal advice?

A: Not at all. Not at all.

Q: What is it then?

A: No, I was not acting as an attorney. I told her what my understanding of the outcome would be, and I never told her that she did not have a right to seek outside counsel if she chose to.

Q: You didn't discuss outside counsel with her either way, whether she did or she didn't have a right, correct?

A: Alice never asked me for legal advice and I never gave her legal advice. 1 N.T. at 164–65; *see also* 1 N.T. at 152 ("I didn't tell her not to get an attorney.").

As will be discussed immediately below, Ms. Overlander received a court notice which, *inter alia,* informed her of the debtor's bankruptcy filing and a forthcoming meeting of creditors. Upon its receipt, she telephoned Mr. Fellheimer:

A [Overlander]: [reading from deposition transcript] "I don't know about the dischargeability procedure. I only knew that I could be present [at the creditors' meeting], because I had lent him this money and that I should probably go to a lawyer. And he said it's not necessary that you be there and I said, well, what do you want me to do with it? He said, just take it and throw it in the trash and don't worry about it. That was his answer."

Q: He didn't say don't go to a lawyer, did he?

A: He was my attorney.

1 N.T. at 85.

As a creditor, Ms. Overlander received various notices from the bankruptcy court. Initially she received a "Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines," sent November 6, 2003. *See* docket entry # 17. This notice advised her of a February 2, 2004 deadline to file a complaint objecting to the debtor's discharge, with the same deadline for seeking a determination of the nondischargeability of debts. It also included this explanation of "Discharge of Debts" (emphasis added):

The debtor is seeking a discharge of most debts, which may include your debt. **A discharge means that you may never try to collect the debt from**

**the debtor.** If you believe that the debtor is not entitled to receive a discharge under Bankruptcy Code § 727(a) or that a debt owed to you is not dischargeable under Bankruptcy Code § 523(a)(2), (4), (6), or (15), you must start a lawsuit by filing a complaint in the bankruptcy clerk's office by the "Deadline to File a Complaint Objecting to Discharge of the Debtor or to Determine Dischargeability of Certain Debts" listed on the front side.[11] The bankruptcy clerk's office must receive the complaint and the required filing fee by that Deadline.

The notice also stated "The staff of the bankruptcy clerk's office cannot give legal advice. You may want to consult an attorney to protect your rights."

Ms. Overlander does not dispute receipt of this notice. *See* docket entry # 18 (court certificate of service including Ms. Overlander on the service list). When asked why she did not then consult an attorney, Ms. Overlander replied that she did—she called Mr. Fellheimer. 1 N.T. at 87.

On February 3, 2004, the chapter 7 trustee docketed notice of a change in the classification of the bankruptcy case from a chapter 7 no-asset case to an asset case, meaning that the bankruptcy trustee anticipated that there would be non-exempt assets available for distribution. The clerk of court then sent to all creditors a Notice of Deadline to File Proof of Claim, *see* Fed. R. Bankr.P. 3002(c)(5), which stated in part that "assets have been recovered and ... it now appears that a dividend may be payable[.]" *See* Notice, at docket entry # 32. The notice advised that proofs of claim were due by May 3, 2004. *Id.* Ms. Overlander did not file a proof of

claim. As mentioned above, though, no dividend was paid to general unsecured creditors.

Ms. Overlander also received a copy of Mr. Fellheimer's discharge notice. *See* docket entry # 57, 12/17/2004. Included in the notice were statements that "The discharge prohibits any attempt to collect from the debtor a debt that has been discharged" and "The chapter 7 discharge order eliminates a debtor's legal obligation to pay a debt that is discharged." *Id.* The notice also included a list of types of debts that are not discharged in a chapter 7 bankruptcy case, including:

> Debts for which the debtor has given up the discharge protections by signing a reaffirmation agreement in compliance with the Bankruptcy Code requirements for reaffirmation of debts.

Further, this notice stated: "Because the law is complicated, you may want to consult an attorney to determine the exact effect of the discharge in this case." And creditors were also notified that " ... a debtor may voluntarily pay any debt that has been discharged." Ms. Overlander was not certain whether she received the discharge notice, but admits that if she did receive it, she may have opened it but not have read it. 1 N.T. at 91–93.

When she received notices from the bankruptcy court, Ms. Overlander communicated with Mr. Fellheimer. As noted above, she testified that Mr. Fellheimer told her to disregard notices, to let him handle things. She knew what a meeting of creditors was, but when she asked Mr. Fellheimer if she should attend it, she testified that he told her there was no need for her to be present, and therefore she did not attend. *See* ex. D–3, deposition of

---

11. As just mentioned, the front side of the notice sent to Ms. Overlander (and other creditors) stated: "Deadline to File a Complaint

Objecting to Discharge of the Debtor or to Determine Dischargeability of Certain Debts: 2/2/04."

Ms. Overlander, at 222. Mr. Fellheimer denies making any such statements. 2 N.T. at 22–23.

Ms. Overlander justifies believing that Mr. Fellheimer was serving as her attorney during his own bankruptcy case as consistent with prior conduct. During the years of their romantic relationship, Ms. Overlander consulted with Mr. Fellheimer on legal issues several times after he successfully settled her tort litigation. In 1999 or 2000, when she decided to sell her home she consulted with Mr. Fellheimer, who referred her to a real estate attorney with expertise in real estate law. 1 N.T. 94, 100. In 1999, after Ms. Overlander's mother-in-law died, Mr. Fellheimer directed an associate attorney from his law firm to represent her at a legal proceeding, 1 N.T. at 50, ex. P–10, deposition of Ms. Overlander, at 128–29. Mr. Fellheimer also provided her with some advice in 2000 regarding the placement of Ms. Overlander's father into a nursing home. 1 N.T. at 49, 99–100. When her prior state court attorney and doctors in the personal injury case sued her for expenses, Mr. Fellheimer referred her to another law firm to handle the dispute. See 1 N.T. at 167–68; ex. P–10, Fellheimer deposition at 125–126.

After his bankruptcy filing, Ms. Overlander spoke to Mr. Fellheimer concerning certain legal matters. In 2004, when she was falsely accused of stealing a neighbor's wallet, Mr. Fellheimer assisted her by making some telephone calls and sending letters. 1 N.T. at 172–73. Moreover, when the pair were involved in a minor rear-end car accident in Ms. Overlander's car, Mr. Fellheimer advised her to resolve her claim without involving her insurance carrier. 1 N.T. at 168–69. In responding to Ms. Overlander's requests, Mr. Fellheimer acted without any retainer or fee agreements and never charged her for his services. Furthermore, almost all of this advice was made without entry of appearance.

Ms. Overlander and Mr. Fellheimer resumed an on-and-off again relationship in 2003 until sometime in 2008. 1 N.T. at 38, 172. Ms. Overlander described it as "rocky, to say the least." 1 N.T. at 51. Nevertheless, at various times during this period, Ms. Overlander helped care for Mr. Fellheimer's ill father, comforted Mr. Fellheimer when his mother passed away in 2007, and assisted him after he suffered a heart attack. 1 N.T. at 51; ex. P–10, Fellheimer deposition at 93.

During the time that Mr. Fellheimer lived at his parents' home, Ms. Overlander believed he did not have many expenses since he was able to take her out to dinner on occasion, and he was still practicing as an attorney to some extent. 1 N.T. at 52. She did not know the extent of his limited law practice, but knew that he maintained an office in Doylestown, Pennsylvania. 1 N.T. at 52. Nonetheless, she did not request repayment of her loans; she "just assumed that when he got back on his feet, which was what he said to me, that he would be paying me back the money or when the next large case came in, that I would get the money in full, or if other cases came in, that didn't provide that much money, in increments." 1 N.T. at 52.

Ms. Overlander testified that, in general, she believed Mr. Fellheimer, who told her he would pay her back once he was "back on his feet." 1 N.T. at 94. Mr. Fellheimer disputes that his statements were the source of Ms. Overlander's belief:

Alice knew that I didn't have money, okay. You generally don't ask people to do things that they're not capable of doing.... Alice knew in 2000, 2001, 2002, 2003, et cetera, that I did not have the money to repay it. So at no time after December of 2000 did I ever say to

Ms. Overlander that I would repay the loan. Certainly at no point after the discharge in bankruptcy did I say that I would repay the loan, and Alice never asked me during that time frame because she knew I didn't have assets. I was living at home with my parents. I didn't own a car. The only thing I owned were the clothes on my back.

1 N.T. at 170.

Ms. Overlander took no steps after Mr. Fellheimer's bankruptcy filing to recover on her claim until 2009. Ex. D–3, deposition of Ms. Overlander at 191. She made no demand for payment. She did not consult with counsel. Her conduct changed when, Ms. Overlander states, she was surprised in April 2009,[12] at a dinner at a restaurant in Philadelphia. During that dinner, Mr. Fellheimer told her that an inheritance had made him financially well-off. 1 N.T. at 52–53. "I was kind of hurt because I was sitting there and this man had all of this money and he didn't say well, I'm a millionaire now, here's your money back." 1 N.T. at 53.

Ms. Overlander may have then sought advice of counsel in May 2009. 1 N.T. at 55. However, it was not until October 22, 2009 that Ms. Overlander filed a complaint in this forum seeking to revoke the debtor's bankruptcy discharge and to determine that her claim against him was not dischargeable. This court thereafter dismissed the adversary proceeding for lack of jurisdiction, instructing that the case must first be reopened before any adversary proceeding could be filed. On March 28, 2010, Ms. Overlander filed the instant motion to reopen under consideration here.

## III.

### A.

As mentioned earlier, Ms. Overlander seeks to reopen this closed chapter 7 case in order to file a complaint seeking to revoke the debtor's chapter 7 discharge and to determine that her loan claim against him is not dischargeable under sections 523(a)(2)(A) and (a)(4). Mr. Fellheimer opposes reopening by contending that it is pointless for this court to do so. *See, e.g., In re Schicke,* 290 B.R. 792, 798 (10th Cir. BAP 2003) ("A bankruptcy court that refuses to reopen a Chapter 7 case that has been closed will not abuse its discretion if it cannot afford the moving party any relief in the reopened case."). In so arguing, Mr. Fellheimer focuses upon the deadlines set forth in the Bankruptcy Code and Federal Rules of Bankruptcy Procedure as precluding Ms. Overlander's desired relief.

In relevant part section 727(d) states:

(d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if—

(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge[.]

 Ms. Overlander implicitly contends that she will be able to prove all of the elements of section 727(d)(1) were this case reopened.[13] To do so, she must demonstrate that Mr. Fellheimer obtained his discharge through fraud, rather than defrauding Ms. Overlander prior to his bankruptcy filing. *See, e.g.,* 4 *Norton Bank-*

---

12. Mr. Fellheimer contends the dinner occurred in February 2009. For purposes of this contested matter, the exact month that the dinner took place in 2009 is not material.

13. There is no suggestion that the provisions of subsections (d)(2) or (d)(3) are relevant, and subsection (d)(4) to section 727 was added in 2005, after this case was commenced.

*ruptcy Law and Practice 3d*, § 86.23 (2010). Although denying that Ms. Overlander could meet her burden under section 727(d)(1), Mr. Fellheimer emphasizes section 727(e), which provides:

(e) The trustee, a creditor, or the United States trustee may request a revocation of a discharge—

(1) under subsection (d)(1) of this section within one year after such discharge is granted[.]

Clearly, the one year period for seeking revocation under section 727(d)(1) has long since expired, as the debtor's discharge was granted in 2004. *See In re Poff,* 344 Fed.Appx. 523 (11th Cir.2009); *In re Martin,* 96 Fed.Appx. 62, 65 (3d Cir.2004); *In re Herzig,* 96 B.R. 264, 267 n. 1 (9th Cir. BAP 1989). Thus, Mr. Fellheimer contends that this case should not be reopened for Ms. Overlander to file a complaint seeking revocation of discharge when such a complaint must be dismissed as untimely. *See, e.g., In re Poff; In re Collins,* 2008 WL 5749935 (Bankr.N.D.Cal. 2008); *see also In re Savage,* 167 B.R. 22 (Bankr.S.D.N.Y.1994).

Similarly, section 523(c)(1) governs nondischargeability complaints brought under sections 523(a)(2), (a)(4) and (a)(6). Federal Bankruptcy Rule of Procedure 4007(c) establishes a deadline for filing a nondischargeability complaint governed by section 523(c):

Except as otherwise provided in subdivision (d), a complaint to determine the dischargeability of a debt under § 523(c) shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a). The court shall give all creditors no less than 30 days' notice of the time so fixed in the manner provided in Rule 2002. On motion of a party in interest, after hearing on notice, the court may for cause extend the time fixed under this subdivision. The motion shall be filed before the time has expired.

Ms. Overlander received notice in November 2003 from this court that the deadline for filing such complaints was February 2, 2004. That deadline has long since passed. As no complaint was timely filed, nor was any extension sought prior to its expiration, Mr. Fellheimer now argues that it serves no valid purpose to reopen this case as Ms. Overlander cannot obtain relief under section 523(a)(2) or 523(a)(4). *See, e.g., In re Schicke,* 290 B.R. 792 (10th Cir. BAP 2003); *In re Cohen,* 1995 WL 678244 (S.D.N.Y.1995); *In re Collins,* 2008 WL 5749935, at *2.

Recognizing that the deadlines in section 727(e)(1) and Rule 4007(c) have long expired, Ms. Overlander argues that promissory estoppel and equitable estoppel should be applied and, if so, these would render her proposed complaint against Mr. Fellheimer timely.

For the following reasons, I disagree.

### B.

Promissory estoppel is used in appropriate circumstances to enforce a promise made without consideration. *See MDNet, Inc. v. Pharmacia Corp.,* 147 Fed.Appx. 239, 244 (3d Cir.2005) (nonprecedential) ("Promissory estoppel is applied to enforce a promise not supported by consideration, where there is no binding contract."); *see generally* Restatement (Second) of Contracts § 90 (2010). Under federal common law, its elements are:

(1) that the defendant made a promise, (2) that the defendant reasonably should have expected to induce the promisee's reliance, (3) that the promise actually induced such reliance, (4) that the reliance was reasonable, and (5) that injustice can be avoided only by enforcement of the promise.

*Local 107 Office & Professional Employees International Union v. Offshore Logistics, Inc.*, 380 F.3d 832, 834 (5th Cir.2004); *see, e.g., Miller Automotive Group, Inc. v. General Motors Corp.*, 216 F.3d 1083, 2000 WL 491693 (9th Cir.2000); *Aguilar v. International Longshoremen's Union Local No. 10*, 966 F.2d 443, 445 (9th Cir.1992). Promissory estoppel thus creates an enforceable contract based on oral representations; it does not toll a statute of limitations.

 Insofar as revocation of discharge is concerned, Ms. Overlander does not suggest that Mr. Fellheimer promised her that he would not seek a discharge, nor that he would waive his discharge under section 727(a)(10) of the Bankruptcy Code. Thus, this estoppel principle does not override the limitations period found in section 727(e)(1). *See generally C & K Petroleum Products, Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir.1988).[14]

Insofar as the nondischargeability of her claim based upon section 523(a) is concerned, sections 524(c), (d), and (k), which govern the reaffirmation process, preclude the application of promissory (or equitable) estoppel.

 In general, "the appropriate way to waive discharge as to a specific debt, as opposed to waiving the discharge in the bankruptcy case, is through the use of reaffirmation agreements." *In re Rul-Lan*, 186 B.R. 938, 943 (Bankr.W.D.Mo. 1995). The Bankruptcy Code permits a debtor to reaffirm a debt—that is, be legally bound to repay the obligation despite discharge in bankruptcy, *see, e.g., Matter of Duke*, 79 F.3d 43 (7th Cir.1996); *In re Getzoff*, 180 B.R. 572 (9th Cir. BAP 1995); *In re Hovestadt*, 193 B.R. 382 (Bankr. D.Mass.1996)—only with a detailed procedure set out by the provisions of section § 524(c), (d) and (k). Among other requirements, reaffirmation agreements must be filed with the court and either be approved by the bankruptcy court at a hearing, or contain a verified statement by debtor's counsel in support of the reaffirmation request. Further, the agreement must contain a clear statement that the reaffirmation may be rescinded within 60 days after filing with the court, or prior to the entry of a discharge order, whichever occurs later.

 These statutory provisions "provide for strict limitations on the ability of a debtor to enter into a binding agreement reaffirming a debt that would otherwise be discharged. Only an agreement that conforms to all of the requirements of these subsections is valid." 4 *Collier on Bankruptcy*, ¶ 524.01 at 524–17 (16th ed. 2010) (footnote omitted). As further stated by this commentator:

> If an agreement to pay a discharged or dischargeable debt does not meet the requirements of [sections 524(c), (d), and (k)] it is without legal effect.... The subsections have been applied strictly by the courts to carry out their remedial

14. Thus, I need not consider the other elements of promissory estoppel. Moreover, there is no suggestion that equitable estoppel concerning the issuance of the chapter 7 discharge is germane. *See In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir.1996) ("One species of equitable estoppel is promissory estoppel, which may be applied where there has been a clear and unambiguous promise, reasonable and foreseeable reliance on the promise, and an unconscionable injury as a result of the reliance."). The Third Circuit Court of Appeals has explained, "to succeed on a traditional estoppel defense the litigant must prove (1) a misrepresentation by another party; (2) which he reasonably relied upon; (3) to his detriment." *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir.1987). Ms. Overlander does not contend that Mr. Fellheimer made any promise to waive his chapter 7 discharge.

purposes and to ensure that they are not evaded by agreements which, though not labeled as reaffirmations, have the effect of waiving the protections of the discharge.

*Id.* at ¶ 524.04, at 524–40 (footnotes omitted).

■ If a written agreement by a debtor that fails to meet the requirements of a reaffirmation is not enforceable, *see, e.g., In re Minor,* 115 B.R. 690 (D.Colo.1990); *In re Mascoll,* 246 B.R. 697, 701 (Bankr. D.D.C.2000); *In re Sheehan,* 153 B.R. 384 (Bankr.D.R.I.1993), and if reaffirmation agreements themselves are subject to rescission by the debtor, *see* 11 U.S.C. § 524(c)(4), then an oral statement of the debtor to pay a creditor made during a bankruptcy case (or thereafter) would not be enforceable by virtue of promissory or equitable estoppel. *See, e.g., In re Santos,* 112 B.R. 1001, 1007 (9th Cir. BAP 1990). Therefore, even if I accept Ms. Overlander's testimony, denied by Mr. Fellheimer, that during the bankruptcy case he promised to repay her loans, such an oral promise would not be enforceable under promissory estoppel.[15] *See In re Close,* 2003 WL 22697825 (Bankr.E.D.Pa.2003).

Accordingly, the principles of promissory and equitable estoppel would be of no assistance to Ms. Overlander in obtaining the relief she desires under sections 727(d)(1) or 523(a)(2)(A) or 523(a)(4). *See generally In re Rowland,* 275 B.R. 209, 217 (Bankr.E.D.Pa.2002).

### C.

■ Ms. Overlander relies primarily upon the doctrine of equitable tolling—a doctrine that stops the running of a limitations period—in support of her argument that a valid purpose would be served in reopening this chapter 7 case. Equitable tolling is applied only in limited circumstances:

Federal courts have typically extended equitable relief only sparingly. We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights. *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 1725, 80 L.Ed.2d 196 (1984).

*Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990) (footnotes omitted).

■ "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo,* 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005). Furthermore, "[i]t is hornbook law that limitations periods are 'customarily subject to "equitable tolling,"' *Irwin v. Department of Veterans Affairs* ... unless tolling would be 'inconsistent with the text of the relevant statute.'" *Young v. U.S.,* 535 U.S. 43, 49, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) (quoting *United States v. Beggerly,* 524 U.S. 38, 48, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998)) (citation omitted).

■ The Third Circuit Court of Appeals has also provided instructions as to

---

**15.** Of course, 11 U.S.C. § 524(f) permits a debtor to voluntarily repay any debt after discharge.

the appropriate application of this doctrine:

> The doctrine of equitable tolling stops a statute of limitations period from running after a claim has accrued, ... but should be applied "sparingly." ... Appellant bears the burden of proving that the equitable tolling doctrine applies here.... There are three principal situations in which equitable tolling is appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action, and that deception causes non-compliance with an applicable limitations provision; (2) where the plaintiff in some extraordinary way has been prevented from asserting his rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.

*Podobnik v. U.S. Postal Service,* 409 F.3d 584, 591 (3d Cir.2005) (citations omitted); *see New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1125–26 (3d Cir.1997).

■ Courts have construed the provisions of sections 727(d)(1) and (e)(1) as expressing a congressional intent to preclude the application of equitable tolling. *See, e.g., In re Abdelmassia,* 362 B.R. 207, 212–13 (Bankr.D.N.J.2007); 4 *Norton Bankruptcy Law and Practice,* § 86:23 n. 13 (2010); *see also* 6 *Collier on Bankruptcy,* ¶ 727.16 (15th ed. rev. 2009) ("Like the time limit of section 727(e)(1), [the] time limit [under section 727(e)(2)] is not subject to equitable tolling."). The language of section 727(d)(1) and (e)(1) supports this conclusion. As one court has observed:

> This Court has not been directed to any decisions that sanction the use of equitable tolling in the context of § 727(e)(1). Moreover, its own research has proved fruitless in finding such a decision. By contrast, there exists a number of opinions concluding that equitable tolling is not applicable with respect to § 727(e)(1). *See Northrup v. Phillips (In re Phillips),* 233 B.R. 712, 717 (Bankr.W.D.Tex.1999); *Roost v. Reynolds (In re Reynolds),* 189 B.R. 199, 203 (Bankr.D.Or.1995); *Int'l State Bank v. Fresquez (In re Fresquez),* 167 B.R. 973, 975 (Bankr.D.N.M.1994); *Clay County Bank v. Culton (In re Culton).* 161 B.R. 76, 79 (Bankr.M.D.Fla.1993). Reading the doctrine of equitable tolling into § 727(e)(1) appears to upset a decision already made by Congress. Section 727(e)(1), when read in conjunction with § 727(d)(1), appears already to account for the circumstances that equitable tolling is designed to remedy. *Section 727(d)(1), by its express terms, is not applicable unless the party requesting the revocation of a debtor's discharge did not know of the operative fraud until after the granting of a discharge. Thus, the application of § 727(d)(1) always involves a party who has not discovered fraud until some period after the debtor receives his or her discharge. Yet § 727(e)(1) clearly imposes a one-year time limit beginning from the date of the debtor's discharge, notwithstanding the fact that the party requesting revocation has not discovered the relevant fraud until some time after discharge.* Accordingly, when § 727(e)(1) is placed against the backdrop of § 727(d)(1), it appears that Congress did not intend for equitable tolling to apply to § 727(e)(1). *See Phillips,* 233 B.R. at 716 ("Congress must have intended that equitable tolling not apply to § 727(e)(1)."); *Reynolds,* 189 B.R. at 203 ("[T]he doctrine of equitable tolling is fundamentally inconsistent with the provisions of § 727(d)(1) and § 727(e)(1).").

*In re Bevis,* 242 B.R. 805, 809 (Bankr. D.N.H.1999) (emphasis added); *accord In*

*re Abdelmassia,* 362 B.R. at 213; *In re Dolliver,* 255 B.R. 251, 255–56 (Bankr. D.Me.2000). Moreover, the language of Fed. R. Bankr.P. 9024, which rule incorporates Fed.R.Civ.P. 60, but expressly states that "a complaint to revoke a discharge in a chapter 7 liquidation case may be filed only within the time allowed by § 727(e) of the Code[.]", also supports this conclusion.

Congress has made a policy determination in section 727 that the importance of finality of a chapter 7 discharge after one year overrides any equitable considerations implicated by the equitable tolling doctrine. *See In re Bevis,* 242 B.R. at 810. Accordingly, reopening this closed chapter 7 case would not now permit Ms. Overlander to obtain a revocation of Mr. Fellheimer's bankruptcy discharge.

### D.

The applicability of the doctrine of equitable tolling is less clear when applied to the deadline imposed by section 523(c) and Rule 4007(c) upon creditors seeking a determination that their claims are not dischargeable under sections 523(a)(2), (4), and (6). As noted recently by one commentator, this issue has divided courts. Lockhart, *Equitable Tolling of Federal Rules of Bankruptcy Procedure, Rule 4007(c), Providing 60–Day Deadline for Filing Dischargeability Complaints,* 40 A.L.R. Fed. 2d 541 (2009) (collecting cases).

The Supreme Court in *Kontrick v. Ryan,* 540 U.S. 443, 454, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004), held that the deadline contained in Rule 4004(a), restricting time to object to a debtor's discharge, is not jurisdictional. Consistent with this view, Courts of Appeals have held that the similarly-worded deadline found in Rule 4007(c) also is not jurisdictional. Because non-jurisdictional federal statutory deadlines generally can be tolled, therefore equitable tolling arguably applies to extend the Rule 4007(c) deadline. *See e.g., In re Maughan,* 340 F.3d 337 (6th Cir.2003) (statutory filing deadlines are generally subject to the defenses of waiver, estoppel, and equitable tolling); *In re Benedict,* 90 F.3d 50, 54 (2d Cir.1996).

The Third Circuit Court of Appeals has not expressly addressed whether the doctrine of equitable tolling applies to the Rule 4007(c) deadline. *In re Weinberg,* 197 Fed.Appx. 182, 186 n. 4 (3d Cir.2006) (non-precedential) ("We thus need not decide on this appeal whether principles of equitable tolling are properly considered in calculating the timeliness of a complaint under Rule 4007(c)."). A bankruptcy court in this circuit has held that equitable tolling of the Rule 4004(a) deadline is available in limited circumstances. *See In re Rychalsky,* 318 B.R. 61, 64 (Bankr.D.Del. 2004). If so, a similar result would apply to the Rule 4007(c) deadline.

Other bankruptcy courts in this district have assumed that the Rule 4007(c) deadline may be equitably tolled, but then concluded that such tolling was inapplicable on the facts presented. *See In re Pendergrass,* 376 B.R. 473, 479 (Bankr.E.D.Pa. 2007); *In re Rowland,* 275 B.R. at 216–17 (Bankr.E.D.Pa.2002). I shall do the same. That is, I will assume that the deadline for filing a nondischargeability complaint set forth in Rule 4007(c) can be equitably tolled. The facts presented by Ms. Overlander, however, do not support the application of that doctrine.

Ms. Overlander makes the following argument in support of the applicability of this doctrine. First, when Mr. Fellheimer filed his bankruptcy petition in 2003, she was suffering from cognitive impairment and Mr. Fellheimer knew it. Second, whether accurate or not, Ms. Overlander considered Mr. Fellheimer her attorney for all legal matters that may arise, includ-

ing his own bankruptcy case, and Mr. Fellheimer knew that as well. Third, Mr. Fellheimer misled her by advising her to take no actions in his bankruptcy case and never suggested that she consult with an attorney to discuss her rights. Fourth, during the bankruptcy case, Mr. Fellheimer promised to repay her claim. Fifth, she did not know and had no reason to know that he had no intention of repaying her loans to him until April 2009.

Mr. Fellheimer challenges all of these contentions. He maintains that Ms. Overlander has sufficient mental capabilities to: live on her own; consult with a financial advisor; fire her initial tort lawsuit attorney and hire him; participate and render decisions (such as rejecting an initial settlement offer) during her tort case; and even help take care of him during his illness. Based upon her testimony in court, I would agree that Ms. Overlander understood questions posed to her, and drew inferences from disparate data (*e.g.*, that loans made by Mr. Fellheimer's parents would be inconsistent with previous statements he made to her). Moreover, she expressed sensible concerns regarding the uses of the proceeds of her loans and Mr. Fellheimer's ability to repay.

Thus, I find unpersuasive the implication made by Ms. Overlander that she had insufficient mental capacity to understand her rights, and insufficient mental ability to avoid being manipulated by Mr. Fellheimer. More persuasive from the evidence presented is that she loaned funds to Mr. Fellheimer owing to her affection for him, and still held him in affection during his bankruptcy case.

Her second contention—that at the time of his bankruptcy filing, Mr. Fellheimer was or was perceived to be representing Ms. Overlander, and therefore was in a conflicted position and had a duty to advise her to retain counsel—is also problematical. At the time of his bankruptcy filing, Mr. Fellheimer had not entered any court appearance, nor notified any third parties of his representation on behalf of Ms. Overlander in any pending legal matter. Clearly, he took no steps to act as Ms. Overlander's attorney in his chapter 7 case. *See generally, Rode v. Branca,* 481 F.Supp. 808, 810 (E.D.N.Y.1979) (attorney's business agreement with client was not entered into in his capacity as counsel for the client).

Moreover, his scheduled income and assets were sufficiently limited that his chapter 7 case was initially classified as a no-asset case. Only during the bankruptcy case was a referral fee payable, and that fee (not from the Canoe case) was claimed by a creditor as part of its collateral. As a result, no creditors in Ms. Overlander's category received any dividend, and her failure to file a proof of claim had no adverse consequence. Indeed, had Ms. Overlander consulted a bankruptcy attorney with the idea of obtaining a distribution in his chapter 7 case, she would have paid for such services without receiving any benefit. Thus, Mr. Fellheimer's failure to advise her to seek counsel preserved her assets, which may have been his intention at the time.[16]

---

16. Of course, had Ms. Overlander obtained bankruptcy counsel during Mr. Fellheimer's bankruptcy case, such counsel probably would have advised her of the need to obtain a reaffirmation agreement if she hoped to be repaid post-discharge. Whether Mr. Fellheimer would have signed such an agreement is unknown. But such speculation does not trigger the application of equitable tolling.

Moreover, to the extent that a reaffirmation agreement constitutes an enforceable contract, *see, e.g., In re Pickerel,* 433 B.R. 679, 685 (Bankr.N.D.Ohio 2010); *In re Carlos,* 215 B.R. 52, 63 (Bankr.C.D.Cal.1997) ("If a reaffirmation is approved by the court, the credi-

Accordingly, Ms. Overlander's complaint—that Mr. Fellheimer's failure to advise her to seek counsel in his bankruptcy case should trigger equitable tolling because it deprived her of the opportunity to obtain a dividend or a reaffirmation agreement—is problematic on these facts. Thus, her primary contention is that Mr. Fellheimer failed to advise her to obtain bankruptcy counsel knowing that he had committed a fraud in obtaining loans from her, and feared her consulting an attorney lest his conduct be uncovered by such counsel. As such, Ms. Overlander argues that he actively misled her.

As to such fraud, Ms. Overlander suggests two misrepresentations made by Mr. Fellheimer in 2000 and 2001 when he received loan proceeds. First, when he borrowed funds from her, he had no intention of repaying her despite his statements to the contrary. Second, Mr. Fellheimer lied to her when explaining that the borrowed funds were being used by him to help fund the Canoe litigation.[17]

As to the former, Ms. Overlander herself testified to the contrary. 1 N.T. at 91–92 ("Q. And in fact, you have always thought that he intended to pay it back, haven't you? A. Yes. Q. You've never come to the conclusion that it was not his intention to repay it, at the time he borrowed the money, have you? A: No, I trusted him."). As to the latter, her repeated queries to him about the uses of the borrowed funds, his non-replies, her learning from others that the Canoe litigation was over and yet still she loaned additional funds, are all inconsistent with this theory.

Moreover, upon listening to Mr. Fellheimer's testimony and reviewing his deposition transcript, I find it highly unlikely that he believed he had committed any fraud when he borrowed funds from Ms. Overlander. Prior to his bankruptcy filing, Mr. Fellheimer had recommended that Ms. Overlander consult with a financial advisor. It follows that his communications with Ms. Overlander during his bankruptcy case were not intended to keep hidden his prepetition conduct, as he did not believe it fraudulent. Indeed, by Ms. Overlander's logic, Mr. Fellheimer had no need to telephone Ms. Overlander about his impending bankruptcy filing. She was certain to call him about it when receiving court notice. At that time, if it was his intention to do so, he could dissuade her from seeking legal advice.

Therefore, I find credible his testimony that his advance notice to her of his forthcoming bankruptcy was provided out of courtesy, not out of any intent to mislead. I also find credible his testimony that he

---

tor has a new binding contract with the debtor that the creditor may enforce in a court of competent jurisdiction."), under Pennsylvania law the limitations period for enforcement of contracts is four years. 42 Pa.C.S.A. § 5525(a)(1). Mr. Fellheimer received his bankruptcy discharge in December 2004. Reaffirmation agreements must be entered into before a discharge is granted. 11 U.S.C. § 524(c)(1). Ms. Overlander was content to take no action regarding her unpaid loans until 2009, after the four-year limitations period would have expired.

**17.** Ms. Overlander's argument that her claim against Mr. Fellheimer fell within the scope of section 523(a)(4) (in addition to section 523(a)(2)) arises from her contention that at all times from 1995 onward, including during his bankruptcy case, Mr. Fellheimer represented Ms. Overlander as if on general retainer. (Without explanation, she argues that this legal representation ended in 2005–06. Overlander Memorandum at 5 (unpaginated)). Mr. Fellheimer rejects this contention. Even if he was acting as her attorney, and thus was in a fiduciary capacity, Ms. Overlander must still prove under section 523(a)(4) that his debt to her arose as a result of a fraud committed while acting as her fiduciary. *See In re Hampton,* 407 B.R. 443 (Table), 2009 WL 612491, at *2 (10th Cir. BAP 2009).

told her that his bankruptcy filing would discharge her claim. That she chose to believe that he would nonetheless repay her after the bankruptcy, when he was financially solvent, does not trigger application of equitable tolling owing to active misleading on the part of Mr. Fellheimer.

Ms. Overlander's position that Mr. Fellheimer's oral promise to repay her, made while his bankruptcy case was pending, also does not justify the imposition of equitable tolling. As noted earlier, Congress intended that reaffirmation agreements under section 524(c), (d) and (k) be the sole method by which creditors holding a dischargeable debt may create a legally enforceable obligation. It is inappropriate for this court to employ an equitable doctrine to circumvent such express congressional intent. *See generally In re Close*, 2003 WL 22697825, at *7 (despite the debtors' repeated oral promises to repay a creditor made during and after their bankruptcy case, creditor found in contempt for attempting to enforce that promise postpetition).

In addition, the evidence does not demonstrate that Ms. Overlander was sufficiently diligent so as to validly raise equitable tolling at this time.

First, if I assume for purposes of this contested matter that Mr. Fellheimer fraudulently misrepresented either his intention to repay Ms. Overlander or his ability to repay from the proceeds of the Canoe litigation, there were sufficient warnings to Ms. Overlander prior to his bankruptcy filing that her trust in him might be misplaced and that action to protect her rights may be required.

Prior to the 2003 bankruptcy filing, Ms. Overlander had learned of the failure of the Canoe litigation. According to her testimony, she had also experienced Mr. Fellheimer's antagonism and evasiveness toward her questions about the use of the loan funds and their repayment. The telephone call from his mother informing her that Mr. Fellheimer had borrowed funds from his parents was purportedly inconsistent with his reasons for seeking loans from her. Together, these facts should have suggested that the individual to whom she had loaned money had not told her the truth and was not satisfactorily answering her questions; furthermore, her assumed source of repayment had evaporated. Certainly together, these facts should have awakened inquiry in her to investigate further and/or take action to protect her interests. Instead, she continued to believe that Mr. Fellheimer would repay her when financially able and so she took no action. *See also Kelly v. Longan*, 5 Cal.2d 274, 277, 53 P.2d 971 (1936):

> [The facts] were, in fact, brought home to the plaintiff's knowledge and notice nearly four years before action was brought. Thereafter, the plaintiff continued to rely on the promises and representations made by the respondents, supported, no doubt, by an erroneous and misplaced confidence in the integrity of the promisors. Unhappily, that is not sufficient to toll the statute in the present case.

Second, during his bankruptcy case, Ms. Overlander chose to ignore all of the court notices sent to her. Instead, after being informed by Mr. Fellheimer that he intended to seek to have her debt discharged, she still opted to believe that he would remain liable to her and again took no action. *Cf. United States v. Petty*, 530 F.3d 361 (5th Cir.2008) (refusing to apply equitable tolling, noting that discrepancy between notice from the court and advice received from assistant clerk at the court should have prompted the defendant to investigate further).

Third, after the bankruptcy case was concluded Ms. Overlander was content to

take no action for years. She simply "assumed that when he got back on his feet, which was what he [had] said to me [prior to 2003], that he would be paying me back the money...." 1 N.T. at 52. The relationship during that post-bankruptcy period was described as "rocky," so that Ms. Overlander might never learn if Mr. Fellheimer's financial circumstances were improved. In other words, the evidence suggests that Ms. Overlander from 2001 to 2009 decided to allow Mr. Fellheimer to determine when and if he was able to repay her loans, however many years that would take. Such passivity does not equate to diligence. *See generally Salois v. Dime Savings Bank of New York, FSB,*

128 F.3d 20, 26 (1st Cir.1997) ("In simpler terms, fraud may render reasonable a plaintiff's otherwise unreasonable conduct, but there are limits: plaintiffs must still exercise reasonable diligence in discovering that they have been the victims of fraud."); *Toy v. Metropolitan Life,* 863 A.2d 1, 8 (Pa.Super.2004) (finding lack of reasonable diligence where plaintiff waited 20 months without action or inquiry for never-delivered savings plan information). Therefore, the evidence does not demonstrate either that Mr. Fellheimer actively misled Ms. Overlander to forfeit her rights during his bankruptcy case, nor that she exercised sufficient diligence in protecting those rights.[18]

**18.** Implicit in Ms. Overlander's present motion to reopen is an assumption on her part, the correctness of which I need not address but one Mr. Fellheimer would likely challenge in state court, were this court to reopen this bankruptcy case and grant Ms. Overlander relief under section 523(a), or revoke the debtor's discharge.

In general, Pennsylvania has a four year statute of limitations to collect on unpaid loans. *See* 42 Pa.C.S.A. § 5525; *Gurenlian v. Gurenlian,* 407 Pa.Super. 102, 595 A.2d 145 (1991). The other state law claims that Ms. Overlander intends to prosecute were this bankruptcy case reopened and her debt held to be nondischargeable (or discharge revoked) all have limitations periods ranging from two years to at most six years. *See* 42 Pa.C.S.A. §§ 5524, 5525, 5527. *See, e.g., Sevast v. Kakouras,* 591 Pa. 44, 53, 915 A.2d 1147 (2007) (four-year limitations period for unjust enrichment); *Aquilino v. Philadelphia Catholic Archdiocese,* 884 A.2d 1269, 1275 (Pa.Super.2005) (two-year limitations period for intentional infliction of emotional distress, fraud, breach of fiduciary duty).

To the extent that these limitations periods had not expired at the time of Mr. Fellheimer's bankruptcy filing in 2003, section 108(c) of the Bankruptcy Code would extend those limitations for only 30 days after the case was closed in 2006, which closing terminated the bankruptcy stay under section 362(c)(2)(A). *See generally In re Hermosilla,* 430 B.R. 13, 20 (Bankr.D.Mass.2010); *James v. McCoy,* 56 F.Supp.2d 919, 929–31 (S.D.Ohio 1998).

Were this closed bankruptcy case to be reopened under section 350(b), as Ms. Overlander requests, and were her claim thereafter held to be nondischargeable under section 523(a) or the discharge revoked, she assumes that she could commence litigation in state court to obtain a judgment against Mr. Fellheimer and then execute upon that judgment.

Whether she could do so may well depend upon whether the state law limitations periods had expired for claims based upon loans made in 2000 and 2001. As noted earlier, the parties did not agree to a particular repayment or maturity date for these loans. Accordingly, Ms. Overlander must believe that under Pennsylvania law some tolling principle would apply, such as the discovery rule, or that the limitations period for collection litigation was tolled until she made a demand for payment. *But see Gurenlian v. Gurenlian,* 407 Pa.Super. at 113, 595 A.2d 145:

[T]he agreement between appellant and George was oral and contained no conditions precedent or terms for repayment. Having carefully reviewed the record, we conclude that the agreement in the instant case was not one where a demand was necessary to perfect a cause of action, and, thus, the running of the statute of limitations was not contingent on a demand being made.

If Ms. Overlander could persuade a state court that the limitations period only commenced upon her demand in 2009, she must further convince that court that she made her demand within a reasonable time. *See id.,*

Moreover, this lack of diligence is coupled with prejudice to Mr. Fellheimer were Ms. Overlander now permitted to raise her fraud issues under section 523(a). *Cf. Costello v. U.S.*, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961) ("Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."); *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Product Liability Litigation*, 375 Fed.Appx. 269, 272 (3d Cir.2010) (nonprecedential) (Laches "requires inexcusable delay in bringing suit and prejudice to the defendant as a result of the delay.").

For Mr. Fellheimer to defend against a nondischargeability action under section 523(a)(2) or (a)(4) involving loans received in 2000 and 2001, he may need to present evidence regarding that which Ms. Overlander knew or should have known, albeit from persons who are or may no longer be available (*e.g.*, Mr. Fellheimer's parents); whose memories may have faded in the intervening decade (*e.g.* his law partner), and records related to his financial circumstances and pending cases (*e.g.*, Canoe) that Mr. Fellheimer testified were no longer available to him. Such prejudice militates against reopening a closed bankruptcy case as well as against the application of equitable tolling.

## IV.

In sum, Ms. Overlander argues that Mr. Fellheimer acted improperly in entering into a romantic relationship with her and then borrowing a significant amount of money from her in 2000 and 2001, given his prior legal representation of her as well as his knowledge of her cognitive impairments. Furthermore, she contends that he actively misled her from asserting her rights in his chapter 7 bankruptcy case filed in 2003. As a result, she asserts that she should be permitted to litigate nondischargeability and discharge issues that were to be raised no later than 2004 and 2005, and this court should reopen this closed bankruptcy case or order for her to do so.

After considering all of the evidence and reviewing all of the memoranda submitted, I conclude that Ms. Overlander has not demonstrated that the limitations periods set forth in 11 U.S.C. § 727(e) and Fed. R. Bankr.P. 4007(c), which expired at least five years ago, should now be tolled. Accordingly, no valid purpose would be served in reopening this bankruptcy case and so the better exercise of discretion is to deny the motion.

An order to that effect will be entered.

### ORDER

AND NOW, this 13th day of October 2010, for the reasons stated in the accompanying memorandum, it is hereby ordered that the motion of Ms. Alice Overlander to reopen this closed bankruptcy case under 11 U.S.C. § 350(b) is denied.

---

407 Pa.Super. at 113 n. 2, 595 A.2d 145 ("In such cases where a demand is necessary to perfect the cause of action and the time of the demand is within the plaintiff's control, the demand must be made within a reasonable time."). The discovery rule would require a showing of due diligence on her part. *Fine v. Checcio*, 582 Pa. 253, 266–68, 870 A.2d 850 (2005). Thus, the same issues of delay and lack of diligence would surface in any state court litigation brought by Ms. Overlander.